Nos. 25-1313, 25-1939

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

————————————

**PACITO, et al.**,

Plaintiffs-Appellees,

v.

**DONALD J. TRUMP, et al.**,

Defendants-Appellants.

————————————

On Appeal from the United States District Court
for the Western District of Washington
District Court Case No. 2:25-cv-255

————————————

**CONSOLIDATED BRIEF FOR APPELLANTS**

————————————

YAAKOV M. ROTH
*Acting Assistant Attorney General*
DREW C. ENSIGN
*Deputy Assistant Attorney General*
ERNESTO MOLINA
*Deputy Director*
DAVID KIM
*Senior Litigation Counsel*
JOSEPH MCCARTER
ALEXANDRA YEATTS
LINDSAY ZIMLIKI
JASON ZUBATA
*Trial Attorneys*
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
Washington, DC 20005

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................iii

INTRODUCTION ............................................................................1

STATEMENT OF JURISDICTION...................................................5

STATEMENT OF ISSUES ...............................................................5

STATEMENT OF THE CASE ..........................................................6

    I.     The Executive's Authority to Suspend Entry of Aliens and to
          Set Foreign Aid ............................................................6

    II.    The Refugee Act...........................................................8

    III.   The USRAP and Foreign Aid Executive Orders ............11

    IV.   The State Department Implements the USRAP and Foreign Aid
          Orders .......................................................................12

    V.    The State Department Terminates Cooperative Agreements
          with Resettlement Partners...........................................13

    VI.   The District Court Issues the First and Second Injunctions .............14

    VII.  This Court Largely Stays the First Injunction Pending Appeal ........16

STANDARD OF REVIEW...............................................................16

SUMMARY OF ARGUMENT ........................................................17

ARGUMENT..................................................................................19

    I.     Defendants Are Likely to Succeed on the Merits...........................19

A.    The District Court Erred in Concluding that the INA and Refugee Act Preclude the USRAP Order as the USRAP Order Is a valid Exercise of the President's Broad Authority Under 8 U.S.C. § 1182(f).19

B.    The USRAP Order Does Not Violate the Due Process Clause 29

C.    The District Court Was Barred from Reviewing Plaintiffs' Contractual Funding Claims ............................................... 30

D.    Plaintiffs Failed to Properly Plead APA Claims ................... 35

II.    Equitable Factors Likewise Require Reversal ............................... 48

III.    At a Minimum, the Court Should Reverse the Impermissibly Broad Aspects of the First and Second Injunctions ....................... 51

CONCLUSION ................................................................................ 54

CERTIFICATE OF COMPLIANCE ............................................. 56

CERTIFICATE OF SERVICE ....................................................... 56

# TABLE OF AUTHORITIES

## Cases

*Abourezk v. Reagan*,
    785 F.2d 1043 (D.C. Cir. 1986) .................................................................. 6

*Allende v. Shultz*,
    845 F.2d 1111 (1st Cir. 1988) .................................................................. 20

*Amoco Prod. Co. v. Vill. of Gambell, AK*,
    480 U.S. 531 (1987) .................................................................. 49

*Balt. Gas & Elec. Co. v. NRDC*,
    426 U.S. 87 (1983) .................................................................. 38

*Band of Pottawatomi Indians v. Patchak*,
    567 U.S. 209 (2012) .................................................................. 31

*Bembenista v. United States*,
    866 F.2d 493 (D.C. Cir. 1989) .................................................................. 33

*Bennett v. Spear*,
    520 U.S. 154 (1997) .................................................................. 45, 46

*Cal. Chamber of Commerce v. Council for Educ. & Research on Toxics*,
    29 F.4th 468 (9th Cir. 2022) .................................................................. 17

*Califano* v. *Yamasaki*,
    442 U.S. 682 (1979) .................................................................. 52

*California v. Azar*,
    911 F.3d 558 (9th Cir. 2018) .................................................................. 3, 52

*Chamber of Commerce of U.S. v. Whiting*,
    563 U.S. 582 (2011) .................................................................. 6

*Dep't of Educ. v. Cal.*,
    145 S. Ct. 966 (2025) .................................................................. passim

iii

*Dep't of State v. Muñoz*,
   602 U.S. 899 (2024) ...................................................................29

*Doe 1 v. Jaddou*,
   ___F. Supp. 3d___, 2025 WL 327368 (D. Md. Jan. 29, 2025) ......................24

*Doe #1 v. Trump*,
   957 F.3d 1050 (9th Cir. 2020)......................................................22

*East Bay Sanctuary Covenant v. Barr*,
   934 F.3d 1026 (9th Cir. 2019).................................................. 3, 52

*eBay Inc. v. MercExchange, L.L.C.*,
   547 U.S. 388 (2006) ...................................................................49

*Elkins v. Moreno*,
   435 U.S. 647 (1978) ....................................................................6

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992) ...................................................................46

*Gonzalez v. Cuccinelli*,
   985 F.3d 357 (4th Cir. 2021).......................................................24

*Great-West Life & Annuity Ins. Co. v. Knudson*,
   534 U.S. 204 (2002) ...................................................................32

*Hawaii v. Trump*,
   859 F.3d 741 (9th Cir. 2017)................................................. 25, 53

*Hawaii v. Trump*,
   583 U.S. 941 (2017) ...................................................................25

*Heckler v. Chaney*,
   470 U.S. 821 (1985) ...................................................................47

*Ingersoll-Rand Co. v. United States*,
   780 F.2d 74 (D.C. Cir. 1985)......................................................31

*INS v. Aguirre-Aguirre*,
    526 U.S. 415 (1999) ........................................................40

*INS v. Legalization Assistance Project of L.A. Cty. Fed'n of Lab.*,
    510 U.S. 1301 (1993)......................................................52

*James v. Caldera*,
    159 F.3d 573 (Fed. Cir. 1998)........................................32

*Kidwell v. Dep't of Army*,
    56 F.3d 279 (D.C. Cir. 1995) .........................................33

*Kiobel v. Royal Dutch Petroleum*,
    569 U.S. 108 (2013) ................................................ 50, 52

*Lincoln v. Vigil*,
    508 U.S. 182 (1993) .......................................................47

*Louisiana v. Becerra*,
    20 F.4th 260 (5th Cir. 2021) ..........................................52

*Lujan v. Nat'l Wildlife Fed'n*,
    497 U.S. 871 (1990) .......................................................44

*Maine Cmty. Health Options v. United States*,
    590 U.S. 296 (2010) .......................................................35

*Maryland v. King*,
    567 U.S. 1301 (2012).....................................................50

*Megapulse, Inc. v. Lewis*,
    672 F.2d 959 (D.C. Cir. 1982)........................................31

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*,
    463 U.S. 29 (1983).................................................... 39, 43

*Myers v. United States*,
    272 U.S. 52 (1926).........................................................50

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
    886 F.3d 803 (9th Cir. 2018) ........................................................17

*Nken v. Holder*,
    556 U.S. 418 (2009) ........................................................49

*Norton v. SUWA*,
    542 U.S. 55 (2004) ........................................................44

*Regan v. Wald*,
    468 U.S. 222 (1984) ........................................................36

*Stormans, Inc. v. Selecky*,
    586 F.3d 1109 (9th Cir. 2009) ........................................................16

*Trump v. Hawaii*,
    585 U.S. 667 (2018) ........................................................ passim

*Trump v. New York*,
    592 U.S. 125 (2020) ........................................................28

*U.S. Conf. of Catholic Bishops v. U.S. Dep't of State*,
    ___F. Supp. 3d___, 2025 WL 763738 (D.D.C. Mar. 11, 2025)................ 34, 54

*United Aeronautical Corp. v. U.S. Air Force*,
    80 F.4th 1017 (9th Cir. 2023) ........................................................ 31, 32

*United States ex rel. Knauff v. Shaughnessy*,
    338 U.S. 537 (1950) ........................................................7

*United States v. Curtiss-Wright Exp. Corp.*,
    299 U.S. 304 (1936) ........................................................7

*United States v. Munsingwear*,
    340 U.S. 36 (1950) ........................................................25

*Winter v. NRDC*,
    555 U.S. 7 (2008) ........................................................16

**Statutes**

5 U.S.C. § 701(a)(2)................................................................46

5 U.S.C. § 704......................................................................45

8 U.S.C. § 1101......................................................................6

8 U.S.C. § 1157......................................................... 2, 24, 26

8 U.S.C. § 1157(a)(1)(2)..........................................................24

8 U.S.C. § 1157(a)(2)......................................................3, 8, 24, 50

8 U.S.C. § 1157(c)(1)..............................................................48

8 U.S.C. § 1157(c)(2)(A).................................................. 9, 10, 30

8 U.S.C. § 1157(c)(3).............................................................9

8 U.S.C. § 1157(c)(4)..............................................................50

8 U.S.C. § 1159(a)..................................................................51

8 U.S.C. § 1182(f)........................................................ passim

8 U.S.C. § 1185(a)(1)...................................................... 7, 19, 20

8 U.S.C. § 1185(d)...................................................................26

8 U.S.C. § 1201(h)...................................................................26

8 U.S.C. § 1522.......................................................... 10, 33

8 U.S.C. § 1522(a)(1)(A).................................................11, 37, 38

8 U.S.C. § 1522(a)-(b).......................................................37, 38

8 U.S.C. § 1522(b)(1)(A)..........................................................37

8 U.S.C. § 1522(b)(7)................................................................38

8 U.S.C. §§ 1101(a)(42)............................................................9

22 U.S.C. § 2346(a)..................................................................8

22 U.S.C. § 2601(c)(1).............................................................8

28 U.S.C. 1346(a)(2)...............................................................31

28 U.S.C. § 1292(a)(1).............................................................5

28 U.S.C. § 1331......................................................................5

28 U.S.C. § 1491(a)................................................................31

**Rules**

Fed. R. App. P. 4(a)(1).............................................................5

Fed. R. Civ. P. 65(c).........................................................15, 51

**Regulations**

2 C.F.R. § 200.340.......................................................14, 43, 49

8 C.F.R. § 207.7(a)..................................................................9

8 C.F.R. § 207.9.....................................................................50

45 C.F.R. § 400......................................................................11

45 C.F.R. § 400.11(a).............................................................11

**Other Authorities**

Exec. Order No. 14163, *Realigning the United States Refugee Admissions Program*, 90 Fed. Reg. 8459 (Jan. 20, 2025)........................................ passim

Exec. Order No. 14169, *Reevaluating and Realigning United States Foreign Aid*, 90 Fed. Reg. 8610 (Jan. 20, 2025) ........................................ passim

84 Fed. Reg. 53991 (Oct. 4, 2019).................................................................22

Pub. L. No. 87-510...........................................................................................8

Pub. L. No. 96-212...........................................................................................8

Pub. L. No. 118-47..........................................................................................47

## INTRODUCTION

This Court has already largely stayed, pending appeal, the district court's two universal preliminary injunctions that override the President's invocation of his statutory and constitutional authority to suspend refugee entry into the United States. As the Court expressly recognized, the Government is likely to succeed on the merits of its appeal, and the balance of equities favored a stay. Dkt. No. 46.1. For the same reasons, this Court should now vacate the district court's injunctions.

The district court's first injunction ("First Injunction") blocked the President's Executive Order suspension of the U.S. Refugee Admissions Program, which the President based on the determination that further entry of refugees would be detrimental to the interests of the United States. Such enjoinment directly contravenes *Trump v. Hawaii*, 585 U.S. 667 (2018), the plain text of the relevant immigration statutes, and bedrock principles of Article III and equity. The district court's second injunction ("Second Injunction") would have forced the Government to maintain contracts with refugee resettlement partners, in part to sustain the terms of the First Injunction. The Second Injunction collapses without that predicate, plus the district court unequivocally lacks jurisdiction over federal contract disputes. As the stay panel recognized, these injunctions are deeply flawed and threaten irreparable harm to the United States.

1

Supplementing the President's inherent Article II power, Congress conferred on the President broad statutory authority to "suspend the entry of … any class of aliens" "[w]henever [he] finds that [their] entry … would be detrimental to the interests of the United States." 8 U.S.C. § 1182(f). "By its terms, § 1182(f) exudes deference to the President in every clause"; it reflects a "comprehensive delegation" of authority from Congress to the President. *Hawaii*, 585 U.S. at 684-85.

Relying on that delegation, the President found that "the United States has been inundated with record levels of migration" in recent years, such that continued entry of refugees would be detrimental to the interests of the United States. Exec. Order No. 14163, *Realigning the United States Refugee Admissions Program*, 90 Fed. Reg. 8459 (Jan. 20, 2025) ("USRAP Order") § 1. The President accordingly invoked § 1182(f) (and other authorities) to temporarily suspend the entry of refugees, subject to case-by-case exceptions. *Id.* at § 3(a), (c).

The district court based the First Injunction on its finding that the suspension was unlawful—principally because that the suspension supposedly conflicts with the "purpose and policy" of the Refugee Act of 1980, and "eviscerates an entire statutory scheme, replacing it with the President's unfettered discretion." ER-62. But the First Injunction cannot be reconciled with the core holding in *Hawaii*, which is controlling here. The First Injunction further overlooks that both the Refugee Act (8 U.S.C. § 1157) and § 1182(f) are parts of the same "statutory scheme" (the Immigration and

Nationality Act, or "INA"), and that § 1182(f) authorizes the President to "impose entry restrictions *in addition to* those elsewhere enumerated in the INA," *Hawaii*, 585 U.S. at 684 (emphasis added). Plus, even on its own terms, the text of the Refugee Act *confirms* the President's authority. The Refuge Act sets only a ceiling—not a floor—on the number of refugees to be admitted in any given year. And that ceiling is "such number as the President determines"—which could be zero—so nothing in the INA *requires* refugee admissions. 8 U.S.C. § 1157(a)(2).

Beyond its direct conflict with *Hawaii*, the First Injunction transgresses the power of district courts by setting refugee policy for the entire nation. That overbroad order ignores this Court's admonition to limit relief to "redress only the injury shown as to [Plaintiffs]." *California v. Azar*, 911 F.3d 558, 584 (9th Cir. 2018). Indeed, this Court has repeatedly applied that rule to narrow nationwide injunctions in the immigration context. *See*, *e.g.*, *East Bay Sanctuary Covenant v. Barr*, 934 F.3d 1026, 1029 (9th Cir. 2019).

The First Injunction also overrode the decision of the President and Secretary of State to temporarily suspend foreign aid contracts—suspensions meant to ensure the contracts were consistent with administration priorities. The district court's enjoinment of the contract suspensions was wrong but soon overtaken by events, as the State Department chose to *terminate* specifically the cooperative agreements

3

awarded to Plaintiff Resettlement Partners.[1] But the district court doubled down in its Second Injunction—wrongly exercising control, once again, over arising contractual disputes, despite the jurisdiction to review such disputes lying solely in the Court of Federal Claims under the Tucker Act. Moreover, the Supreme Court's intervening stay order in *Dep't of Educ. v. Cal.*, 145 S. Ct. 966, 968 (2025), eliminated any doubt that might have existed regarding district court's lack of jurisdiction to review these types of contractual claims.

The Second Injunction irreparably harms the Government by forcing it to enter into contracts not only with the two Plaintiff Resettlement Partners, but with all resettlement partners—some of which the Government prevailed against in other litigation—after the Government determined the contracts do not align with its priorities. These forced contractual relationships could cost the Government millions of dollars that it has little hope of clawing back even if the Government ultimately prevails in this suit. This Court should reverse.

---

[1] USRAP partners include (1) resettlement support centers ("RSCs") that conduct refugee applicant processing overseas, and (2) resettlement agencies ("RAs") that provide domestic reception and placement services ("R&P") to refugees in the United States. Some entities, including organizational plaintiffs HIAS and CWS, serve as both RAs and RSCs.

4

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331. It issued the First Injunction in writing on February 28, 2025, ER-101, and the Second Injunction on March 24, 2025, ER-39. Defendants filed respective notices of appeal on February 28 and March 25, 2025, ER-1097-1100. *See* Fed. R. App. P. 4(a)(1). This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF ISSUES

1. Whether the district court erred in enjoining the President's temporary suspension of refugee entry, which he found to be in the national interest pursuant to his constitutional and statutory powers;

2. Whether the district court lacked jurisdiction under the Administrative Procedure Act to hear Plaintiffs' challenge to the suspension and subsequent termination of cooperative agreements with resettlement partners, where those suspensions and terminations amount to contractual disputes over funding; and

3. Whether the district court erred in granting relief on Plaintiffs' Administrative Procedure Act claims targeting implementation of the President's order.

5

**STATEMENT OF THE CASE**

**I.    The Executive's Authority to Suspend Entry of Aliens and to Set Foreign Aid**

The Immigration and Nationality Act of 1952 ("INA"), 8 U.S.C. § 1101 et seq., as amended, established "a comprehensive and complete code covering all aspects of admission of aliens to this country." *Elkins v. Moreno*, 435 U.S. 647, 664 (1978); *accord Chamber of Commerce of U.S. v. Whiting*, 563 U.S. 582, 587 (2011). Central to this case, under the INA, the President enjoys broad discretionary authority to suspend or restrict the entry of all aliens:

> **(f) Suspension of entry or imposition of restrictions by President**
>
> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate. …

8 U.S.C. § 1182(f). "The President's sweeping proclamation power" under § 1182(f) provides, among others, "a safeguard against the danger posed by any particular case or class of cases that is not covered by one of the" INA's grounds for denying admission of aliens in § 1182(a). *Abourezk v. Reagan*, 785 F.2d 1043, 1049 n.2 (D.C. Cir. 1986). Numerous Presidents have invoked § 1182(f) to suspend or impose restrictions on the entry of certain aliens or classes of aliens, and the Supreme Court has repeatedly upheld the broad sweep of this authority. *See, e.g.*, *Hawaii*, 585 U.S. at 684.

6

Ultimately, Congress has given the President broad discretion to determine "whether and when to suspend entry," "whose entry to suspend," "for how long," "and on what conditions ('any restrictions he may deem to be appropriate')." *Hawaii*, 585 U.S. at 684. Congress has similarly deemed it unlawful for "any alien" to enter or attempt to enter the United States "except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe." 8 U.S.C. § 1185(a)(1).

This congressional delegation of authority to suspend entry of any aliens or any class of aliens coheres with (and is bolstered by) the President's broad inherent constitutional authority under Article II relating to foreign affairs and national security. *See United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950) ("The exclusion of aliens is a fundamental act of sovereignty … inherent in the executive power to control the foreign affairs of the nation."); *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 320 (1936) (discussing "the very delicate, plenary and exclusive power of the President … in the field of international relations—a power which does not require as a basis for its exercise an act of Congress").

Similarly, the statutory framework governing foreign assistance grants the President broad discretion to set the conditions on which the United States provides such assistance. Indeed, the Foreign Assistance Act of 1961 ("FAA"), and similar

statutes, explicitly allow for the provision of assistance "on such terms and conditions as [the President] may determine." *See, e.g.*, section 531 of the FAA (22 U.S.C. § 2346(a)) (assistance to promote economic or political stability); section 2(c)(1) of the Migration and Refugee Assistance Act of 1962, (MRAA), Pub. L. No. 87-510, 76 Stat. 121 (22 U.S.C. § 2601(c)(1)).

## II.    The Refugee Act

The Refugee Act of 1980 amended the INA to establish "a permanent and systematic procedure for the admission to this country of refugees of special humanitarian concern to the United States, and to provide comprehensive and uniform provisions for [their] effective resettlement." Pub. L. No. 96-212, 94 Stat. 102, § 101(b). The Refugee Act provides that the maximum number of refugees that may be admitted annually shall be "such number as the President determines, before the beginning of the fiscal year and after appropriate consultation [with Congress], is justified by humanitarian concerns or is otherwise in the national interest." 8 U.S.C. § 1157(a)(2). The Refugee Act does not require the admission of any particular number of refugees—or, indeed, of any refugees at all, if the President sets the ceiling at zero.

Subject to numerical limits set annually by the President, the Secretary of Homeland Security has discretion to admit "any refugee who is not firmly resettled in any foreign country, is determined to be of special humanitarian concern to the

United States, and is admissible (except as otherwise provided under [8 U.S.C. § 1157(c)(3)]) as an immigrant" under the INA. 8 U.S.C. § 1157(c)(1); *see also* 8 U.S.C. §§ 1101(a)(42) (defining "refugee"), 1182(a) (general inadmissibility grounds). The Report to Congress on Proposed Refugee Admissions determines, before the beginning of the fiscal year, which refugees are "of special humanitarian concern" to the United States for the purpose of refugee resettlement. ER-890–91 ¶ 9. Refugees admitted in accordance with this provision are sometimes referred to as "principal" applicants or refugees.

In addition, certain individuals who do not meet the statutory definition of a refugee may nonetheless be entitled to refugee status if they are accompanying or "following-to-join" a principal refugee. *See* 8 U.S.C. § 1157(c)(2)(A); 8 C.F.R. § 207.7(a). To obtain "derivative refugee" status, an applicant must be the spouse or unmarried child under the age of 21 of a principal refugee and must also be admissible (except as otherwise provided under 8 U.S.C. § 1157(c)(3)) as an immigrant under the INA. 8 U.S.C. § 1157(c)(2)(A). Derivative refugees who are either in the physical company of the principal refugee when admitted to the United States or admitted within four months of the principal refugee's admission are called "accompanying" refugees. 8 C.F.R. § 207.7(a). Derivative refugees who seek admission more than four months after the principal refugee are called "following-to-join" refugees. *Id.*

9

The INA provides only that such derivative refugees are entitled to refugee *status* if the appropriate application or petition is processed and their relationship as the spouse or child of a principal refugee and their admissibility is established.[2] *See* 8 U.S.C. § 1157(c)(2)(A). The INA does not, however, entitle derivative refugees to be *admitted* to the United States without qualification. Whether a derivative refugee will be admitted depends on whether the derivative refugee establishes eligibility for admission and whether there is sufficient capacity allocated, under the annual refugee limit, to the principal refugee's category. The admission of a derivative who has obtained refugee status is contingent on there being room under the subsection allocation under which the principal refugee's admission is charged, as well as, by implication, the annual refugee limit, set by the President, and that individual establishing their eligibility for admission. *Id.* And, of course, such individuals, like everyone else seeking entry into the United States, may also be subject to the bar on entries under § 1182(f).

Following admission, the INA authorizes the funding of programs by public and private organizations to assist refugees in achieving self-sufficiency. 8 U.S.C.

---

[2] Accompanying derivative refugees are processed via Form I-590, Registration for Classification as Refugee, which is filed in conjunction with the Form I-590 by the principal refugee overseas. Following-to-join derivative refugees are processed via Form I-730, Refugee/Asylee Relative Petition, which the admitted principal refugee files on behalf of the derivative refugee, who may be overseas or in the United States.

§ 1522; 45 C.F.R. § 400. Government support for these programs, however, is not mandatory—and, indeed, is permitted only "to the extent of available appropriations." 8 U.S.C. § 1522(a)(1)(A); *see* 45 C.F.R. §§ 400.11(a), 400.56.

## III.   The USRAP and Foreign Aid Executive Orders

On January 20, 2025, the President signed the USRAP Order, which suspended admission of refugees under the USRAP, pursuant to the President's authority under 8 U.S.C. §§ 1182(f) and 1185(a) and based on the President's finding that the "United States lacks the ability to absorb large numbers of migrants, and in particular, refugees, into its communities in a manner that does not compromise the availability of resources for Americans, that protects their safety and security, and that ensures the appropriate assimilation of refugees." USRAP Order § 1. The USRAP Order also suspended "decisions on applications for refugee status." *Id.* § 3(b). Notwithstanding the general suspension, the USRAP Order allows for admission of refugees on a case-by-case basis should the Secretaries of Homeland Security and State jointly determine such admission is in the national interest and does not pose a threat to the security or welfare of the United States. *Id.* §§ 3(c), 4. The order also sets a process for resuming refugee admissions in the future. *Id.* § 3(c).

That same day, the President also signed Executive Order 14169, *Reevaluating and Realigning United States Foreign Aid* ("Foreign Aid Order"), 90

11

Fed. Reg. 8610 (Jan. 20, 2025), which required agency heads to "immediately pause new obligations and disbursements of development assistance funds to foreign countries and implementing non-governmental organizations, international organizations, and contractors pending reviews of such programs … to be conducted within 90 days." Foreign Aid Order § 3(a). The Foreign Aid Order also required agency heads to review each foreign assistance program under guidelines provided by the Secretary of State to determine "whether to continue, modify, or cease each foreign assistance program." *Id.* § 3(b)–(c). Notwithstanding the pause, the Foreign Aid Order allowed the Secretary of State to waive the 90-day pause on new obligations and disbursements of development assistance funds, or to approve early resumption of other programs. *Id.* § 3(d)–(e).

## IV.    The State Department Implements the USRAP and Foreign Aid Orders

In the days before the administration change, senior officials in the State Department's Bureau of Population and Migration ("PRM") were informed that President Trump intended to suspend refugee admissions under the USRAP through executive order. ER-893 ¶ 18. In 2017, when President Trump previously suspended the USRAP, the suspension took effect immediately, and, following the suspension, some refugees were left at U.S. ports of entry, unable to enter the United States. ER-893–94 ¶ 19. This time, the State Department, upon learning of a forthcoming suspension, cancelled all travel after 12:00 p.m. on January 20, 2025. ER-894 ¶ 20.

The State Department did so out of an abundance of caution because most refugees travel to the United States from around the world—a trip that involves multiple layovers and can take multiple days. *Id.* Consequently, the State Department cancelled travel scheduled between January 20 and 27 to avoid the risk that refugees would still be in transit when the suspension went into effect and possibly be stranded at a U.S. port of entry or at an airport in a foreign country. *Id.*

Following the Foreign Aid Order's directive to *immediately* cease foreign aid payments, the State Department, on January 24, 2025, issued 25 STATE 6828, an "All Diplomatic and Consular Posts" (ALDAC) cable "paus[ing] all new obligations of funding, pending review, for foreign assistance programs funded by or through the Department and USAID." ER-896 ¶ 26. This pause applied to assistance funded from accounts in title III of the Department of State, Foreign Operations, and Related Programs Appropriations Act, to include the Migration and Refugee Assistance account, from which funding for initial reception and placement services is provided to resettlement agencies. ER-895-96 ¶¶ 23-26. Thus, the Order's halt on foreign aid included payments to resettlement agencies in the United States. ER-896 ¶¶ 24-26.

## V.  The State Department Terminates Cooperative Agreements with Resettlement Partners

On February 26, 2025, the State Department terminated all USRAP-related cooperative agreements for each Resettlement Partner, except Plaintiff CWS's cooperative agreement for operation of the Resettlement Support Center ("RSC") in

13

Africa (which remained under a suspension notice). ER-769. The State Department did so after determining that the affected cooperative agreements "no longer effectuate[d] agency priorities." ER-756–66. The State Department did not terminate the agreements pursuant to the USRAP or Funding Orders but did so in accordance with the State Department's "Standard Terms and Conditions, 2 C.F.R. 200.340, and/or Award Provisions as applicable." *Id.* The State Department required the Resettlement Partners to stop all work under the terminated agreements and prohibited them from incurring new costs, but did not prohibit them from receiving compensation for legitimate costs incurred prior to the terminations going into effect. *Id.*

## VI. The District Court Issues the First and Second Injunctions

On February 11, 2025, Plaintiffs filed their first motion for preliminary injunction, seeking to block the USRAP and Foreign Aid Orders, ER-907, which Defendants opposed, ER-852. The court orally issued a nationwide injunction from the bench, enjoining the implementation of § 3(a), (b), and (c), and § 4 of the USRAP Order. ER-101. On February 28, the court issued a written order enjoining Defendants from: (1) enforcing or implementing § 3(a), (b), (c), and § 4 of the USRAP Order; (2) suspending or implementing the suspension of refugee processing, decisions, and admissions; (3) suspending or implementing the suspension of USRAP funds pursuant to the Foreign Aid Order; and (4) withholding

14

reimbursements to resettlement partners for USRAP-related work performed pursuant to cooperative agreements before January 20, 2025. ER-99–100. Defendants promptly appealed the First Injunction. ER-1099–1100.

After the State Department terminated all but one USRAP-related cooperative agreement on February 26, 2025, the district court allowed Plaintiffs to amend their complaint and file a new preliminary injunction motion. Plaintiffs did so on March 11, 2025. ER-767. Defendants again opposed, ER-137, and alternatively asked the district court to issue a bond pursuant to Federal Rule of Civil Procedure 65(c), ER-35–36.

On March 24, 2025, the district court granted Plaintiffs' motion and issued the Second Injunction. ER-36–37. The court's order enjoined Defendants, except for President Trump individually, from implementing the termination of USRAP-related cooperative agreements, required the State Department to reinstate all terminated cooperative agreements to their pre-February 26 status, and enjoined the State Department from terminating any USRAP-related cooperative agreements without complying with applicable statutes and regulations. Second Preliminary Injunction §§ (b)–(d). ER-36–37. On March 25, 2025, Defendants appealed the Second Injunction. ER-1097–98. On March 28, 2025, this Court consolidated Defendants' appeals of the First and Second Injunctions. Dkt. No. 31.1.

## VII.  This Court Largely Stays the First Injunction Pending Appeal

On March 8, 2025, Defendants asked this Court to stay the First Injunction pending appeal. Dkt. No. 5.2. On March 25, 2025, this Court partially granted Defendants' stay motion. Dkt. No. 28. On April 21, 2025, this Court clarified its March 25 order, stating that Defendants are likely to succeed on the merits of their appeal of the First Preliminary Injunction because "§ 1182(f) exudes deference to the President in every clause." Dkt. No. 46.1 at 3 (quoting *Hawaii*, 585 U.S. at 684). This Court therefore stayed the majority of the First Injunction, providing only a narrow carveout for individuals (1) whose refugee or follow-to-join applications had been approved, (2) who were cleared for travel, and (3) who already had arranged and confirmable travel plans to the United States prior to January 20, 2025. *Id.* at 4. For these individuals only, the First Injunction remains in effect. *Id.*

## STANDARD OF REVIEW

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. NRDC*, 555 U.S. 7, 22 (2008). A plaintiff must demonstrate "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009).

16

This Court "reviews the district court's decision to grant or deny a preliminary injunction for abuse of discretion. … The district court's interpretation of the underlying legal principles, however, is subject to de novo review and a district court abuses its discretion when it makes an error of law." *Cal. Chamber of Commerce v. Council for Educ. & Research on Toxics*, 29 F.4th 468, 475 (9th Cir. 2022). A district court commits legal error when its "decision is based on an erroneous legal standard," meaning: "(1) the court did not employ the appropriate legal standards that govern the issuance of a preliminary injunction; or (2) in applying the appropriate standards, the court misapprehended the law with respect to the underlying issues in the litigation." *Id.*

Likewise, this Court "review[s] the scope of an injunction for abuse of discretion." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 823 (9th Cir. 2018).

## SUMMARY OF ARGUMENT

The district court legally abused its discretion in granting the First and Second Injunctions. Specifically, it erred in holding that Plaintiffs were likely to succeed on the merits of their claims even though: (1) the President satisfied 8 U.S.C. § 1182(f)'s sole prerequisite (the President's finding that entry "would be detrimental to the interests of the United States") when issuing the USRAP Order; (2) the district court lacked jurisdiction over Plaintiffs' APA challenges to the

suspension and subsequent termination of Resettlement Partner cooperative agreements because those challenges are essentially contractual disputes over funding and must be heard by the Court of Federal Claims, *Dep't of Educ.*, 145 S. Ct. at 968; and (3) the agencies' implementation of the USRAP and Foreign Aid Orders and termination of cooperative agreements was not arbitrary, capricious, or otherwise contrary to law.

The district court also abused its discretion in holding that equitable factors supported issuance of the First and Second Injunctions. Plaintiffs will not suffer irreparable harm absent the Injunctions: Individual Plaintiffs are not entitled to refugee or following-to-join status; individual Plaintiffs have not established they are at risk of persecution in the countries where they reside; and Plaintiff Resettlement Partners can seek a remedy for their alleged harms in the Court of Federal Claims, where Congress has intentionally channeled such claims. The Government, on the other hand, will suffer irreparable harm absent reversal: The Injunctions undermine the Executive Branch's ability to execute immigration laws, intrude on sensitive areas of immigration and foreign policy, require the Government to resettle individuals the President has deemed contrary to the national interest, and will potentially cost the Government millions of dollars it has little chance of recovering should Defendants ultimately prevail in this suit.

18

Last, the district court abused its discretion in granting the nationwide First Injunction rather than limiting its scope to the Plaintiffs themselves. The court exceeded its role in doing so, essentially setting immigration policy for the entire country. The court similarly abused its discretion in extending the Second Injunction's reach to all Resettlement Partners even though doing so was unnecessary to redressing the two organizational Plaintiffs' alleged harms.

## ARGUMENT

As the stay panel already appreciated, this Court should reverse the district court's First and Second Injunctions because (1) Plaintiffs are not likely to succeed on the merits; (2) Plaintiffs will not suffer irreparable harm due to the Injunctions; and (3) the Injunctions harm the Government's interest and the public interest, which merge here. And at absolute minimum, the Court should narrow the First and Second Injunctions' impermissibly broad terms.

## I.    Defendants Are Likely to Succeed on the Merits

### A.    The District Court Erred in Concluding that the INA and Refugee Act Preclude the USRAP Order as the USRAP Order Is a Valid Exercise of the President's Broad Authority Under 8 U.S.C. § 1182(f)

Section 1182(f) provides that whenever the President finds that the entry of "any class of aliens into the United States would be detrimental to the interests of the United States," he may suspend their entry or impose on their entry "any restrictions he may deem to be appropriate." 8 U.S.C. §1182(f); *see also id.*

19

§ 1185(a)(1). Section 1182(f) "exudes deference to the President in every clause," as it "entrusts to the President the decisions whether and when to suspend entry," "whose entry to suspend," "for how long," and "on what conditions." *Hawaii*, 585 U.S. at 684; *see also* 8 U.S.C. § 1185(a)(1) (prohibiting aliens, including refugees, from entering the United States "except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe."); *Allende v. Shultz*, 845 F.2d 1111, 1118 & n.13 (1st Cir. 1988) (§§ 1182(f) and 1185(a) "grant the President vast power to exclude any individual alien or class of aliens whose entry might harm the national interest"). The "*sole prerequisite*" to the President's exercise of authority under this "comprehensive delegation" is the determination that entry of the covered aliens into the United States "would be detrimental to the interests of the United States." *Hawaii*, 585 U.S. at 685 (emphasis added).

Here, the President satisfied § 1182(f)'s sole prerequisite by explicitly finding that "the United States has been inundated with record levels of migration" in recent years and "lacks the ability to absorb large numbers of migrants." USRAP Order § 1. Under *Hawaii*, this is the end of the judicial inquiry. The President's national interest determination is the only requirement for suspending entry of a class of aliens and there are no other limitations on the President's exercise of his § 1182(f) authority, such as setting a fixed end date for a given suspension.

20

The district court, however, wrongly concluded that the USRAP Order did not comport with § 1182(f) because it lacked "some temporal limitation." ER-64. That is not a new argument, but rather one raised—and *specifically rejected*—in *Hawaii*. There, he Court explicitly held that when the President suspends entry under §1182(f), he "is not required to prescribe in advance a fixed end date for the entry restrictions." 585 U.S. at 687. Instead, § 1182(f) "authorizes the President to suspend entry 'for such period as he shall deem necessary,'" and allows him to "link the duration of [entry] restrictions, implicitly or explicitly, to the resolution of the triggering condition." *Id.* Indeed, "not one of the 43 suspension orders issued prior to [the *Hawaii* order by prior Presidents] ha[d] specified a precise end date." *Id.* Nor did the Proclamation that *Hawaii* upheld have an end date; rather, that suspension was to be reviewed every 180 days. *Id.* at 680.

Here, the President permissibly linked his decision to restrict refugee entry to the strain on American communities caused by "record levels of migration" over the past four years. USRAP Order § 1. He further set a procedure and timeline for considering resumption—upon receipt of periodic reports from the Secretaries of State and Homeland Security to be submitted every 90 days (*i.e.*, *more* frequently than the 180-day period approved in *Hawaii*). *Id.* § 4. Section 1182(f) requires nothing more. 585 U.S. at 687. The district court gravely erred in accepting a legal contention that *Hawaii* unequivocally rejected.

21

The district court compounded its error by relying on *Doe #1 v. Trump*, 957 F.3d 1050, 1065 (9th Cir. 2020), to justify its disregard of *Hawaii*. *See* ER-64. First, *Doe #1* predated and was superseded by *Hawaii*. *Doe #1* concluded that a suspension under § 1182(f) must have an endpoint because, "[o]rdinarily, to 'suspend' means to 'cause to stop temporarily.'" 957 F.3d at 1050 (quoting MERRIAM-WEBSTER DICTIONARY (2019)). But the *Hawaii* Court expressly rejected grafting onto § 1182(f) such a requirement merely because the statute uses the word "suspend." 585 U.S. at 687 ("We agree … the word 'suspend' often connotes a 'deferral till later,' … [b]ut that does not mean that the President is required to prescribe in advance a fixed end date for the entry restrictions." (cleaned up)).

Second, *Doe #1* is distinguishable from the case here. The executive order at issue in *Doe #1*—Proclamation 9945—suspended entry of a class of aliens until the President determined the class no longer burdened the American healthcare system. 957 F.3d at 1056-57; 84 Fed. Reg. 53991, 53993 (Oct. 4, 2019). The panel found that "diminishment of uncompensated healthcare costs" was not an adequate future triggering condition for the lifting of the suspension because of factors unique to the domestic healthcare system that are not relevant here. *Doe #1*, 957 F.3d at 1065-67 (citing data that costs had remained stable for two decades and likely would not be impacted by the executive order's requirements). Unlike the stable healthcare costs

22

in *Doe #1*, the "record levels of migration" over the past four years, USRAP Order §§ 1, 4, can undoubtedly change.

Neither the Refugee Act nor any other part of the INA overrides the President's § 1182(f) authority, contrary to the district court's holding. ER-79–81. In the district court's view, notwithstanding the broad language of § 1182(f), the President's actions conflicted with the Refugee Act, including "its purpose and policy judgments." ER-63. Congress, however, layered the President's § 1182(f) authority on top of his authority under § 1157(a) to set the refugee admission ceiling and his authority in § 1185(a)(1) to prescribe restrictions on alien admissions. Indeed, *Hawaii* explained that "§ 1182(f) vests the President with 'ample power' to impose entry restrictions *in addition to those elsewhere enumerated* in the INA." 585 U.S. at 684 (emphasis added). The *Hawaii* Court also rebuked the plaintiffs there for adopting a "cramped" reading of the President's authority under § 1182(f), one that regarded § 1182(f) as conferring on the President "only a *residual* authority to address emergency situations." *Id.* at 691 (emphasis added). The decision below repeats the same reversible error.

Even if trumping unambiguous text with vague notions of "purpose and policy judgments" were a valid approach to statutory interpretation, the district court's results-oriented reasoning is untenable here. Regardless, the Refugee Act itself *confirms* the President's § 1182(f) authority. The Refugee Act empowers the

23

President to set a *maximum* number of refugee admissions each year but does not provide *any minimum* or otherwise require the admission of *any* refugees. *See* 8 U.S.C. § 1157(a)(2). Section 1157's text makes clear that Congress designed the statute as an upper limit or ceiling on the number of refugee admissions each year. For instance, § 1157 prescribes that the President consult with Congress before *increasing* the refugee ceiling but prescribes no similar consultation for *reducing* the ceiling. *See* 8 U.S.C. § 1157(a)(1)(2), (b), (d), and (e). Thus, because the ceiling is "such number as the President determines"—which could be zero—the USRAP Order does not "override particular provisions of the INA," even "assum[ing]" a limitation on the President's § 1182(f) authority did exist. *Hawaii*, 585 U.S. at 689; *see Doe 1 v. Jaddou*, ___F. Supp. 3d___, 2025 WL 327368, at *3-4 (D. Md. Jan. 29, 2025) (holding that § 1157 confers discretionary authority to admit refugees, including "discretion over whether to implement this provision at all" (quoting *Gonzalez v. Cuccinelli*, 985 F.3d 357, 367 (4th Cir. 2021))). This conclusion is even clearer when considering § 1157's additional requirement that the President's refugee ceiling determination be "in the national interest," which mirrors and reinforces the President's § 1182(f) authority to suspend entry if it is not in the nation's interest.

In short, to sustain the district court's finding that the USRAP Order improperly elevated the President's discretionary authority in managing the border

over "an entire statutory scheme," ER-62, one must ignore both the plain language of the Refugee Act and § 1182(f), both of which expressly charge the President with determining whether entry of additional aliens serves the national interest. *That* is the relevant statutory provisions' "purpose and policy judgment"—not the district court's view that some minimum number of refugee admissions must be afforded each year. The district court's usurpation of the President's explicit statutory powers is indefensible.

The district court also erred in its excessive reliance on the panel's decision in the *Hawaii* case before it reached the Supreme Court. *See Hawaii v. Trump*, 859 F.3d 741, 780-81 (9th Cir. 2017) ("*Hawaii I*"). *Hawaii I* concluded that § 1157 does not allow the President to reduce the number of refugees admitted in a given year, but the Supreme Court vacated that decision as moot under *United States v. Munsingwear*, 340 U.S. 36, 39 (1950). *Trump v. Hawaii*, 583 U.S. 941, 941 (2017); *see* ER-97. Vacatur due to mootness "clears the path for future relitigation of the issues between the parties and eliminates a judgment" even in instances where review "was prevented through happenstance." *Munsingwear*, 340 U.S. at 40.

In any event, the USRAP Order does not seek to decrease the refugee ceiling mid-year; instead, the President invoked his separate, standalone authority under § 1182(f) to suspend admission of a "class of aliens" (namely, refugees), with case-by-case exceptions. Given that the maximum is just that—a maximum, not a

25

minimum—there is simply no conflict between §§ 1157 and 1182(f). *See Hawaii*, 585 U.S. at 684. After all, § 1182(f) permits "entry restrictions *in addition to those elsewhere enumerated* in the INA[.]" *Id.* (emphasis added). As such, the district court erred in applying the vacated holding in *Hawaii I*, acknowledging only that it was "vacated on other grounds" as if to imply it still carried precedential weight. ER-96.

The district court also erred by concluding that following-to-join individuals have a statutory entitlement to admission. ER-90. Section 1157 does not mandate the admission of any class of aliens. Congress said as much in 8 U.S.C. § 1201(h), which directs that "[n]othing in this chapter shall be construed to entitle any alien … to be admitted [to] the United States, if, upon arrival at a port of entry in the United States, he is found to be admissible." *See also* 8 U.S.C. § 1185(d). Section 1157 does not purport to provide otherwise.

Instead, § 1157 merely provides that, should there be space under the refugee ceiling and should the following-to-join individual be admitted to the United States, that individual will then have the same refugee *status* as the relative they are joining in the United States. 8 U.S.C. § 1157(c)(2)(A) (a following-to-join individual "shall … be entitled to the same admission *status* as [the principal] refugee *if* the [follow-to-join individual] is admissible"). Likewise, admission of following-to-join individuals "shall be charged against the numerical limitation [refugee ceiling]

26

established" by the President. *Id.* If there is no space left, the individual will not be admitted, despite the individual's refugee status. *Id.*

In other words, § 1157 creates an entitlement to certain status *if* the individual secures admission and the ceiling permits. That is not the same as a guarantee that the individual will be admitted at all. The district court took § 1157(c)(2)(A)'s use of the word "shall" out of context and ignored that following-to-join individuals are still subject to the refugee ceiling and the INA's admissibility requirements. *See* ER-90.

Finally, the district court independently erred in enjoining §§ 3(c) and 4 of the USRAP Order. *See* ER-99 ¶ 1(a). Neither provision is legally deficient, even under the district court's reasoning, and neither could cause Plaintiffs any harm. Section 3(c) provides that "[n]otwithstanding" the rest of the Order, the agencies "may jointly determine to admit aliens to the United States as refugees on a case-by-case basis," if certain conditions are met. On its face, § 3(c) is incapable of causing Plaintiffs *any* harm. Its operation (if not enjoined) could only result in *more* individuals receiving refugee status and admission. The district court never explained how an injunction against § 3(c) was necessary to prevent irreparable harm. Nor does it explain how § 3(c)'s allowance of case-by-case *grants* of refugee status was contrary to the "purpose and policy" of the Refugee Act.

The injunction against § 4 is even more problematic. That section requires the Secretary of Homeland Security to "submit a report to the President … whether resumption of entry of refugees into the United States under the USRAP would be in the interests of the United States" every 90 days. USRAP Order §4. The mere submission of reports obviously cannot cause Plaintiffs any harms, so the district court plainly lacked any basis to enjoin § 4.

Worse still, this portion of the injunction is patently unconstitutional. The Opinions Clause of the Constitution explicitly confers authority upon the President to "require the Opinion, in writing, of the principal Officer in each of the executive Departments." U.S. Const. art. II, § 2 cl.1. The district court's belief that it could strip the President of this explicit constitutional authority is emblematic of the court's profound misunderstanding of its appropriate role in the constitutional order. *Cf. Trump v. New York*, 592 U.S. 125, 133-34 (2020) (per curiam) (observing that district court's injunction prohibiting the Secretary of Commerce from informing the President in a report of the number of aliens without lawful status "implicat[ed] the President's authority under the Opinions Clause, U.S. Const., Art. II, § 2, cl. 1" and was impermissibly based on putative injury that plaintiffs may incur because of "action that the Secretary or President *might* take in the future").

The district court's injunction against § 4 is thus clearly unconstitutional. But even at this late date (following a stay request below), the district court has declined

28

to reconsider its injunction of § 4. *See Pacito v. Trump*, No. 25-255, Dkt. No. 78 (W.D. Wash. Mar. 21, 2025). That the district court—Opinions Clause notwithstanding—thought it could enjoin the President from requiring the opinion of one of his Cabinet Secretaries, and could do so without offering *a word* of reasoning as to how such an injunction could be constitutional, highlights the legal errors underpinning the First Injunction order.

## B.    The USRAP Order Does Not Violate the Due Process Clause

The district court also committed legal error in holding that the refugee suspension violates the Due Process Clause with respect to following-to-join individuals who have relatives in the United States. ER-89–91.

As a threshold matter, Plaintiffs' due process claim is moot because the only two Plaintiffs pressing this claim, Esther and Josephine, received the relief they sought when Josephine was admitted to the United States. *See Pacito*, Dkt. No. 89 at 3 n.3 (Apr. 3, 2025).

Mootness aside, the district court's holding directly conflicts with the Supreme Court's decision in *Dep't of State v. Muñoz*, 602 U.S. 899 (2024). The *Muñoz* Court held—albeit in the visa context—that U.S. citizens do not have "a procedural due process right in *someone else's* legal proceeding." *Id.* at 916. Nor do citizens have a fundamental liberty interest in family members being admitted to the United States. *Id.* at 909. Plaintiffs did not even attempt to reconcile their due process

29

claim with *Muñoz*. They allege that they have "a statutorily created entitlement to benefits under the FTJ process, including *admission* of eligible and admissible family members to the United States as refugees." ER-1092 ¶ 228. But that is just the kind of claim *Muñoz* categorically forecloses.

The district court's ruling is based on a misreading of 8 U.S.C. § 1157(c)(2)(A), which the court interpreted as creating a "statutory" entitlement to a family member's admission to the United States. ER-90. There is no such entitlement, and § 1157(c)(2)(A) simply specifies that once a qualifying relative of a refugee is admitted, they will then have the same refugee status as their petitioner family member. *See supra* pp. 26-27. In any event, like the other provisions of the INA authorizing admission, § 1157(c), too, is subject to a Presidential determination that entry would be detrimental to the interests of the United States. *Hawaii*, 585 U.S. at 684. The Due Process Clause cannot support the First Injunction.

## C. The District Court Was Barred from Reviewing Plaintiffs' Contractual Funding Claims

The preliminary injunction orders—the First Injunction enjoining the funding suspensions; the Second Injunction enjoining the terminations—should also be reversed because the district court lacked jurisdiction over Plaintiffs' funding suspension, reimbursement, and funding termination claims. Plaintiffs are seeking specific performance and monetary compensation, and the Tucker Act forbids APA actions that are disguised contract performance claims.

30

The APA's limited waiver of sovereign immunity does not apply "'if any other statute … expressly or impliedly forbids the relief which is sought.'" *Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012) (quoting 5 U.S.C. § 702). That carveout "prevents plaintiffs from exploiting the APA's waiver to evade limitations on suit contained in other statutes." *Id.*

As relevant in this context, parties seeking specific performance or payment of funds purportedly obligated under contracts must typically proceed under the Tucker Act, not the APA. *See* 28 U.S.C. § 1491(a) (providing that the "United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded" on "any express or implied contract with the United States"); 28 U.S.C. 1346(a)(2) ("[T]he district courts shall not have jurisdiction of any civil action or claim against the United States founded upon any express or implied contract with the United States"). The Tucker Act "'impliedly forbid[s]' an APA action seeking injunctive or declaratory relief" against the government in a federal district court "if that action is a 'disguised' breach-of-contract claim." *United Aeronautical Corp. v. U.S. Air Force*, 80 F.4th 1017, 1026 (9th Cir. 2023) (citing *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982)). That jurisdictional barrier matters, as it ensures that contract claims against the government are channeled into the court that has "unique expertise" in that area. *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 7 (D.C. Cir. 1985). It also matters

31

because the Tucker Act limits Plaintiffs to only money claims or claims for relief that are purely "an incident of and collateral to a money judgment." *James v. Caldera*, 159 F.3d 573, 580 (Fed. Cir. 1998) (citation omitted).

To determine whether a particular action is, at its essence, a contract action subject to the Tucker Act or instead a challenge properly brought under the APA, courts look to both "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought (or appropriate)." *Aeronautical Corp.*, 80 F.4th at 1026. "If rights and remedies are *statutorily* or *constitutionally* based, then districts courts have jurisdiction; if rights and remedies are *contractually* based then only the Court of Federal Claims does, even if the plaintiff formally seeks injunctive relief." *Id.* (emphases in original).

The Supreme Court recently applied these principles in reviewing an order enjoining the Government from terminating education-related grants. *Dep't of Educ.*, 145 S. Ct. at 968. The Court held that the district court's order was, at its core, an order "to enforce a contractual obligation to pay money." *Id.* (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)). Thus, the Tucker Act governed the suit—not the APA—and the district court exceeded its jurisdiction. *Id.* ("Instead, the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.' 28 U.S.C. § 1491(a)(1).").

32

Here, like in *Dep't of Education*, Plaintiffs' requested relief is, at core, contractual. While Plaintiffs posit various statutes and regulations they find to be relevant to their funding suspension and termination claims, no statute or regulation actually requires the government to make payments to resettlement agencies through cooperative agreements. Instead, the Refugee Act *authorizes* the provision of certain services and directs the government to prioritize certain goals. 8 U.S.C. § 1522. To the extent that the government is *obligated* to disburse funds to organizational plaintiffs and other resettlement partners in particular, that obligation can only be as a result of contractual agreements they have entered into—not as a result of any authorizing statute or regulation. The agreements themselves—not the Refugee Act or APA—create the asserted right to payment in the first instance. Plaintiffs thus seek an essentially contractual remedy on an essentially contractual claim, and their suit belongs in the Court of Federal Claims. *See Dep't of Educ.*, 145 S. Ct. at 968.

While Plaintiffs dress up their contractual claims in the language of equity, courts must look to a complaint's "substance, not merely its form." *Kidwell v. Dep't of Army*, 56 F.3d 279, 284 (D.C. Cir. 1995); *see Bembenista v. United States*, 866 F.2d 493, 497 (D.C. Cir. 1989) ("Congress, in passing the Federal Courts Improvement Act, emphasized … it did not want federal court jurisdiction to be manipulated by artful pleading." (quotation omitted)). Plaintiffs might insist that the Government is statutorily obligated to provide refugee resettlement assistance, but

33

they have not explained how that alleged injury could be remedied without the Government being required to make *payment* to Plaintiffs, as well as to non-party resettlement partners, based on the cooperative agreements Plaintiffs wish to enforce. And, that is exactly what the district court did through the First and Second Injunctions—force the Government to continue paying millions of dollars in grant money to organizations it no longer wants to partner with. *See* ER-99, 36-37.

The situation here is not unprecedented. The district court in Washington, D.C., recently rejected a similar attempt by another resettlement partner to disguise contractual claims as APA claims, correctly holding that the resettlement partner's APA claims challenging the pause and termination of cooperative agreements were a demand, "at its core, [for] a purely contractual remedy" that must be brought under the Tucker Act in the Claims Court. *U.S. Conf. of Catholic Bishops v. U.S. Dep't of State*, ___F. Supp. 3d___, 2025 WL 763738, at *1, 6 (D.D.C. Mar. 11, 2025) (on appeal). In yet another similar case, the Supreme Court, no less, granted a stay pending appeal of a temporary restraining order enjoining the Government from terminating various education-related grants and requiring the Government to pay past-due grant obligations. *Dep't of Educ.*, 145 S. Ct. at 969. As it reasoned, while a district court is not barred by "the possibility that an order setting aside an agency's action *may* result in the disbursement of funds," there can be no APA jurisdiction

34

where, as here, the requested relief is, at its base, for enforcement of "a contractual obligation to pay money." *Id.* at 968 (citation omitted) (emphasis added).

This reasoning applies not only to going-forward claims seeking what amounts to specific performance, but also invalidates the district court's order in the First Injunction that the Government reimburse Plaintiff Resettlement Partners for past work. As with claims seeking specific performance of a contractual obligation, claims alleging a contractual obligation to pay "*past* due sums" belong in the Claims Court, not district court. *See Maine Cmty. Health Options v. United States*, 590 U.S. 296, 327 (2010) (emphasis added); *see also id.* (explaining claims over "specific sums already calculated, past due, and designed to compensate for completed labors" "lie[] in the Tucker Act's heartland").

### D.    Plaintiffs Failed to Properly Plead APA Claims

<u>Not Contrary to Law</u>

Defendants did not exceed their statutory authority or act contrary to law under the APA. As to implementation of the USRAP Order, the district court's contrary reasoning was almost entirely derivative of its flawed understanding of the Executive's powers to control immigration and foreign affairs, and thus fails for the same reasons.

As to the suspension and termination of cooperative agreements, Defendant Agencies have wide discretion to operate statutes governing the USRAP and its

many components. This discretion extends to decisions on whether to maintain partnerships with resettlement partners, including whether to pause expenditures to consider whether those partnerships are efficient and consistent with administration priorities, as well as to terminate expenditures and partnerships found to be inconsistent with such priorities.

Indeed, Plaintiffs and the district court do not—and cannot—cite to a statute that mandates international refugee contract partners. The Secretary can manage the international aspects of the USRAP in whatever way he thinks appropriate, and the Executive's authority is at its apex when spending money abroad. *See Regan v. Wald*, 468 U.S. 222, 242 (1984) ("Matters relating to the conduct of foreign relations…are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference."). And, domestically, the Refugee Act authorizes the provision of certain services and directs the Government to prioritize certain goals, but nothing in the plain text of the statute requires the Secretary to fund initial resettlement services at all, let alone to fund services through cooperative agreements with resettlement partners. This understanding is consistent with the Supreme Court's recent clarification that federal agencies retain the discretion to terminate or alter funding arrangements when they deem it necessary, particularly when policy priorities evolve. *Dep't of Educ.*, 145 S. Ct. at 969.

Under Section 1522(b), Congress has "authorized" the Secretary of State to "make grants to, and contracts with, public or private nonprofit agencies for initial resettlement" of "refugees in the United States," 8 U.S.C. § 1522(b)(1)(A),[3] but nothing requires the Secretary to exercise this authority at all or to any specific degree. The district court held that 8 U.S.C. § 1522(a)-(b) requires the Government to provide domestic refugee resettlement assistance, but that is not true. ER-79, 20-21. All that the statute requires, in "providing assistance under" resettlement programs to admitted refugees, is for the Director of the Office of Refugee Resettlement[4] to prioritize certain goals, "to the extent of available appropriations." 8 U.S.C. § 1522(a)(1)(A). Within those parameters, the Director has "authorization" to "make available sufficient resources for employment training and placement in order to achieve economic self-sufficiency among refugees as quickly as possible," "provide refugees with the opportunity to acquire sufficient English language training to enable them to become effectively resettled as quickly as possible," "insure that cash assistance is made available to refugees in such a manner as not to

---

[3] The statute authorizes the Director to make such grants and contracts but allows the President to designate a different officer, *see* 8 U.S.C. § 1522(b)(1)(A)-(B), and the President has designated the Secretary of State, *see* 17 Weekly Compilation of Presidential Documents 2880 (Jan. 13, 1981).

[4] The Office of Refugee Resettlement ("ORR") sits within the Department of Health and Human Services.

discourage their economic self-sufficiency," and "insure that women have the same opportunities as men to participate in training and instruction." *Id*. Section 1522(a)(1)(A) imposes limits on the Director "[i]n providing assistance under this section" and does not create any right to specific assistance or require that grants be consummated in the first place. 8 U.S.C. § 1522(a)(1)(A).

The district court also erred in relying on § 1522(b)(7). That provision states that "[e]ach grant or contract with [a public or private nonprofit] agency under [§ 1522(b)(1)] shall require the agency to do" an enumerated list of tasks. 8 U.S.C. § 1522(b)(7); *see* 8 U.S.C. § 1522(b)(7)(A)-(E). The court reasoned that the funding pause would "prohibit[] resettlement partners from complying with th[ose] statutory obligations." But § 1522(b)(7) simply sets forth requirements for grants or contracts that the Secretary makes; it neither requires that such grants or contracts be made in the first place, nor creates any entitlement to specific grants or assistance on the part of either resettlement agencies or refugees.  The suspension and later termination of the cooperative agreements with Plaintiff Resettlement Partners thus do not violate § 1522.

### *Not Arbitrary and Capricious*

Defendants' challenged actions were not arbitrary and capricious, either. The agencies' temporary suspension of case processing and USRAP operations was rational and consistent with the USRAP Order. *See Balt. Gas & Elec. Co. v. NRDC*,

426 U.S. 87, 105 (1983) (asking whether the agency's action meets a basic standard of reasonableness); *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (a reviewing court may not "substitute its judgment for that of the agency"). Section 1 of the USRAP Order expressly states that the "order suspends the USRAP until such time as the further entry into the United States of refugees aligns with the interests of the United States." Section 4, meanwhile, requires the Secretary of Homeland Security and State to submit reports every 90 days "until [the [President] determine[s] that resumption of the USRAP is in the interest of the United States." Thus, suspending operations is consistent with the purpose of the Order, whose text is directed to the entire USRAP, and not just admissions, which are only one part of the overall refugee resettlement process. Further, suspending operations until admissions may resume is not arbitrary and capricious given that it would be an inefficient use of resources to move refugees to transit centers or conduct pre-departure activities when refugee admissions are barred until the President lifts entry restrictions. ER-17–18. This is particularly true, where some processing activities, such as medical exams and security checks, expire after a certain amount of time. *Id.*

The State Department's suspension of travel prior to the date the refugee entry bar went into effect was also rational and consistent with the USRAP Order. Senior State Department officials learned on or about January 18 or 19 that the incoming

administration intended to issue an executive order suspending refugee admissions and that cancelling refugee travel ahead of issuance would be prudent in light of the concerns explained above. ER-893 ¶ 18. Mindful of the risk of stranding travelers who might have departed for the United States shortly before the suspension went into effect, Department officials cancelled all refugee travel scheduled after January 20. ER-893–94 ¶¶ 19–20. This was not an irrational concern. Because most refugees come from around the world, their travel often includes multiple layovers and spans more than one day. Had refugees still been in transit to the United States on January 27, they could have been stranded at a U.S. port of entry or a foreign airport. ER-894 ¶ 20. And for some refugees, once they have left their country of first refuge, it may be difficult to arrange for their return.

Next, suspending funding for resettlement partners that provide domestic resettlement services was consistent with the Foreign Aid Order because the USRAP *is* a foreign affairs program.[5] *See* Refugee Act § 101(a), 94 Stat. 102 (declaring it a "policy of the United States to encourage all nations to provide assistance and resettlement opportunities to refugees"); *INS v. Aguirre-Aguirre*, 526 U.S. 415, 427 (1999) (explaining the Refugee Act's purposes); Foreign Aid Order § 1, 90 Fed. Reg. at 8619; *id.* § 3(a), 90 Fed Reg. at 8619 (directing all department and agency heads

---

[5] In any case, the Government has maintained that the terminations of the cooperative agreements were lawful, and should the Court agree, the funding suspension issue would be rendered moot.

to "immediately pause new obligations and disbursements of development assistance funds … pending reviews of such programs for programmatic efficiency and *consistency with United States foreign policy*, to be conducted within 90 days of this order" (emphasis added)). Aiding foreign citizens who are living on U.S. soil as refugees still constitutes foreign aid. Indeed, like all USRAP funding, the funds for those domestic services come from the annual "Department of State, Foreign Operations, and Related Programs" appropriations acts. ER-896 ¶ 24; ER-901–02 ¶ 13.

That concern with advancing the President's foreign policy, which informs the Foreign Aid Order, is exactly what led Secretary Rubio to issue the January 24 ALDAC cable, "paus[ing] all new obligations of funding, pending a review, for foreign assistance programs funded by or through the Department and USAID." ER-896 ¶ 26. This pause applied to assistance funded from the Migration and Refugee Assistance lump sum, which includes funding for domestic initial resettlement services. ER-896 ¶¶ 24, 26.

Consistent with the Foreign Aid Order and the ALDAC, the State Department issued a "Notice of Suspension" on January 24, 2025, to its resettlement partners, including Plaintiffs HIAS and Church World Service. ER-896–97 ¶ 27. This Notice advised recipients that awards were "immediately suspended pending a department-wide review of foreign assistance programs" and that "[d]ecisions whether to

41

continue, modify, or terminate" awards would be made following that review. *Id.*
Recipients were directed to stop all work under the awards and not incur any new
costs after January 24, 2025. *Id.* Additionally, recipients were advised they could
submit payment for legitimate expenses incurred prior to the date of the Notice or
for legitimate expenses associated with the Notice. *Id.* By providing resettlement
partners a means to recoup costs incurred prior to the pause and prevent incurring
additional costs, the State Department took the resettlement partners' reliance
interest on government funds into account. The funding suspension, far from being
arbitrary and capricious, thus followed a deliberate, orderly process, with the
President's directives guiding the steps taken by the agencies as they reviewed
foreign assistance programs in furtherance of the national interest.

In light of the foregoing, the district court erred in its assessments of the
funding suspension in multiple ways. The district court found that the Secretary of
State "halted USRAP funding yet g[a]ve no insight into the reasons for that
decision," ER-88, but that is plainly incorrect. The notices to Plaintiffs expressly
cited the Foreign Aid Order as a reason for the stop-work and related directives. ER-
898 ¶ 1. The court also complained that the Government "apparently" did not
"consider reasonable alternatives" to a "blanket suspension" of foreign-aid funding.
ER-88. (citation omitted). But the President made clear that all such funding was to
be "immediately pause[d]" for 90 days in order to conduct an individualized review

42

of each program for consistency with "the foreign policy of the President." Foreign Aid Order §§ 2-3. It can hardly be arbitrary and capricious for a Cabinet Secretary to follow the President's directives. Nor does the district court's apparent preference for a piecemeal approach render the President's and Secretary's determination to the contrary arbitrary and capricious. *See State Farm*, 463 U.S at 43 ("[A] court is not to substitute its judgment for that of the agency.")

Finally, to the extent that the district court faulted the Government for not creating specific procedures to evaluate case-by-case exemptions under § 3(c) of the USRAP Order, ER-74, there is nothing arbitrary and capricious about considering requests for case-by-case exemptions on a case-by-case basis (which necessarily requires individualized consideration).

As to the agencies' terminations of cooperative agreements, regulations and the terms of the cooperative agreements, themselves, permitted termination. The terms of the cooperative agreements explicitly provide that "any award may be terminated … [b]y the Department, to the greatest extent authorized by law, if the award no longer effectuates the program goals or agency priorities." ER-526-27, 718-19. The State Department provided the required written notice consistent with relevant regulation and specified that Plaintiff Resettlement Partners' awards no longer effectuated agency priorities. *See* 2 C.F.R. § 200.340. Neither the terms nor regulations require any more explanation or even advance notice. *See generally*, ER-

43

150–729. And while the district court obviously disagreed with those policy-based determinations, ER-24, federal agencies retain the discretion to terminate or alter funding arrangements when they deem it necessary, particularly when policy priorities evolve. *Dep't of Educ.*, 145 S. Ct. at 969.

### Bars to Review Under the APA

Moreover, Plaintiffs' APA claims suffer from three distinct and independently fatal problems:

**1.     Programmatic Challenge.** Plaintiffs failed to identify any discrete agency action, much less final agency action, that is subject to judicial review. Instead, they mounted a programmatic challenge to a large number of agency decisions that collectively administered the refugee program—*i.e.*, working with resettlement partners; managing refugee case processing, case decisions, admissions, and travel; and providing support services domestically and abroad. ER-927–30. Plaintiffs effectively seek "wholesale improvement of [a] program by court decree, rather than in the offices of the Department or the halls of Congress, where programmatic improvements are normally made." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990). The APA, however, does not permit such challenges, lest it "become the task of the supervising court, rather than the agency, to work out compliance with the [agency's] broad statutory mandate, injecting the judge into day-to-day agency management." *Norton v. SUWA*, 542 U.S. 55, 66-67 (2004).

44

In issuing the First Injunction, the district court deemed Plaintiffs' challenge sufficiently narrow because it found the challenge concerned agency decisions made within a limited period—a window of several days or weeks. ER-71. But a court cannot bundle agency decisions together simply because they were made close in time. And in any event, that justification takes a myopic view of the agencies' administration of the USRAP, which in fact is a comprehensive, integrated process that cannot be reduced to the discrete decisions necessary for an APA challenge.

**2.      Lack of Final Agency Action.** Even if the USRAP process somehow constitutes a discrete agency action, the district court still erred in finding agency implementation of the USRAP and Foreign Aid Orders to be "final" agency actions within the meaning of the APA. *See* 5 U.S.C. § 704. Agency action is final only if the action (1) marks "the consummation of the agency's decisionmaking process" and (2) is "one by which rights or obligations have been determined, or from which legal consequences flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations omitted).

First, the USRAP Order is not a final agency action because it is a temporary pause. The USRAP Order calls for the *temporary* suspension of entry and agency decisionmaking on applications only until the President determines "the resumption of entry of refugees … is in the interests of the United States." USRAP Order § 4. Nothing in the order contemplates a permanent or final state of affairs. When the

district court issued the First Injunction, that temporary order had produced no final agency action as to the suspension of refugee applicant processing, application decisions, or admissions.

Compounding the district court's error, the USRAP Order will not turn into final agency action down the road. Whatever determination the President ultimately reaches will not be subject to challenge, since that final action would be made by the President himself in view of "the interests of the United States." *Id.*; *see Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992) ("no final agency action" where "the final action complained of is that of the President," as "the President is not an agency within the meaning of the [APA]").

Second, and similarly, the Foreign Aid Order did not instigate final agency action because it merely called for a "90 day pause" of financial assistance to allow "for assessment of programmatic efficiencies and consistency with United States foreign policy." Foreign Aid Order ¶ 3(a). In sum, at the time the district court issued the First Injunction, because both Executive Orders outlined temporary pauses, there was no final agency action to enjoin.

**3.** **Committed to Agency Discretion.** Separately, review under the APA is also unavailable here because the State Department's decision to suspend funding to Plaintiff Resettlement Partners and terminate their cooperative agreements was committed to agency discretion by law. 5 U.S.C. § 701(a)(2). The Supreme Court

46

explained in *Lincoln v. Vigil* that the "allocation of funds from a lump-sum appropriation is" an "administrative decision traditionally regarded as committed to agency discretion," because the "very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." 508 U.S. 182, 192 (1993). Indeed, allocating "funds from a lump-sum appropriation requires 'a complicated balancing of a number of factors which are peculiarly within its expertise': whether its 'resources are best spent' on one program or another; whether it 'is likely to succeed' in fulfilling its statutory mandate; whether a particular program 'best fits the agency's overall policies'; and, '… whether the agency has enough resources' to fund a program 'at all.'" *Id.* at 193 (quoting *Heckler v. Chaney*, 470 U.S. 821, 831 (1985)). While such discretion is not unbounded, as long as the agency abides by relevant statutes and regulations, the APA "gives the courts no leave to intrude." *Id.*

That plainly describes the program at issue here. In March 2024, Congress appropriated to the State Department under the heading "Migration and Refugee Assistance" a lump sum of $3,928,000,000 "to remain available until expended" for various "refugee and migration needs," including domestic initial reception and placement benefits. *See* Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, 138 Stat. 460, 729. The Secretary of State is responsible for allocating this

47

single appropriation across a wide range of migration and refugee programs, with nothing in the appropriation constraining the Secretary's discretion regarding how to allocate those funds. And nothing in the Refugee Act suggests Congress intended to permit funding recipients such as Plaintiff Resettlement Partners to contest the Executive Branch's decisions regarding how to allocate appropriations across refugee and migration programs.

## II.    Equitable Factors Likewise Require Reversal

The district court also erred in holding that Plaintiffs established that they were likely to suffer irreparable harm absent the Injunctions. As a threshold matter, refugee status is a purely discretionary benefit, *see* 8 U.S.C. § 1157(c)(1), and being denied a benefit to which one is not entitled in the first place cannot qualify as irreparable harm. And under § 3(c) of the USRAP Order, the relevant officials retain discretion to grant refugee status "[n]otwithstanding the suspension," so Plaintiffs cannot claim irreparable harm on that front either.

Moreover, with one exception, the individual Plaintiffs have been waiting in a third country for months or years for possible admission to the United States—not waiting in their home country where they faced persecution. They do not claim significant risk of harm in those third countries. ER-940–1050. The one Plaintiff who remains in his home country of Iraq based his claim of persecution on an event that occurred 15 years ago during a time of extreme instability, but he has lived there

48

safely since that time. ER-986–92, 1082–83. And Plaintiff Esther and Josephine's claims are moot as Josephine has now been resettled in the United States. *See Pacito*, Dkt. No. 89 at 3 n.3.

As for the Plaintiff Resettlement Partners asserting monetary harms, these resettlement partners can seek payment for outstanding services rendered and dispute the termination of their cooperative agreements in the Court of Federal Claims. Because the Claims Court has the power to remedy these monetary and contractual disputes, any harm arising from these claims is not irreparable. *See, e.g.*, *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) (holding that plaintiffs seeking injunctive relief must demonstrate "that remedies available at law, such as monetary damages, are inadequate to compensate for that injury"); *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 542 (1987) ("In brief, the bases for injunctive relief are irreparable injury and inadequacy of legal remedies."). And, in any case, Plaintiff Resettlement Partners cannot claim to be irreparably harmed by termination of their cooperative agreements, where the Secretary of State is permitted to terminate cooperative agreements at any time if the awards "no longer effectuate[] the program goals or agency priorities." 2 C.F.R. § 200.340.

On the other side of the balance, the Injunctions would irreparably harm the Government and public, whose interests merge here. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Whenever a district court issues a universal injunction against the

49

Executive Branch, the United States suffers a form of irreparable harm. The President is "a representative of the people" and holds "the mandate of the people to exercise his executive power." *Myers v. United States* 272 U.S. 52, 123 (1926). The Government has a substantial interest in carrying out his policies. Courts play an important role in adjudicating the lawfulness of those policies in justiciable cases, but they irreparably injure our democratic system when they forbid the Government from effectuating those policies against anyone anywhere in the Nation. *Cf. Maryland* v. *King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). And those concerns are heightened when, as here, the First Injunction undermines the Executive Branch's constitutional and statutory authority over immigration and the admission of aliens, and thereby constitutes an "unwarranted judicial interference in the conduct of foreign policy." *Kiobel v. Royal Dutch Petroleum*, 569 U.S. 108, 116 (2013).

The First Injunction effectively requires the admission as refugees of some individuals whose admission the President has determined is *not* in the national interest, contrary to the Refugee Act itself, 8 U.S.C. § 1157(a)(2), (e). That harm is irreparable and particularly acute because refugee status, once granted, is, as a practical matter, irreversible. In fact, the sole basis for revoking refugee status is upon a determination that the alien was "not in fact a refugee … at the time of the alien's admission," 8 U.S.C. § 1157(c)(4); *see* 8 C.F.R. § 207.9, and refugees

50

generally are entitled to be admitted as permanent residents after one year, *see* 8 U.S.C. § 1159(a).

Turning to the Second Injunction, it forces the Government to expend taxpayer funds in ways the Government has determined contravene the interests of the country. *See, e.g.*, ER-745. Such forced expenditure of tax payer dollars would do extraordinary harm to the Executive Branch. Publicly accountable executive officials, not Plaintiffs or the district court, are entitled to exercise discretionary judgment about allocating federal funds that belong to publicly accountable executive officials. And the harm to the Government would be truly irreparable because the district court refused to require a Rule 65(c) security bond. ER-36. These funds will be nearly impossible to claw back from Resettlement Partners should the Government ultimately prevail in this suit.

## III.    At a Minimum, the Court Should Reverse the Impermissibly Broad Aspects of the First and Second Injunctions

Each injunction afforded relief to nonparties and was substantially overbroad. At minimum, the Court should reverse or narrow the Injunctions on this basis.

The nationwide scope of the First Injunction was improper here and wholly unnecessary to provide relief to Plaintiffs.

Nationwide or universal remedies exceed "the power of Article III courts," conflict with "longstanding limits on equitable relief," and impose a severe "toll on the federal court system." *Hawaii*, 585 U.S. at 713 (Thomas, J., concurring); *see*

51

*Califano* v. *Yamasaki*, 442 U.S. 682, 702 (1979) (reiterating the "rule that injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs"); *California v. Azar*, 911 F.3d 558, 584 (9th Cir. 2018) (courts should limit relief to "redress only the injury shown as to [Plaintiffs]").

In purporting to set refugee policy for the entire nation, the district court reasoned that a nationwide injunction was proper because the dispute involved immigration law. ER-98. There is, however, no "immigration" exception to the equitable principles just explained. Even in immigration cases, lower courts may redress only the injury shown as to plaintiffs. *See East Bay*, 934 F.3d at 1029 (citing *Azar* for proposition that an injunction must be "narrowly tailored to remedy the specific harms shown"). Otherwise, a district court's overbroad relief would allow "one district [to] make a binding judgment for the entire country." *Louisiana v. Becerra*, 20 F.4th 260, 263 (5th Cir. 2021). Indeed, nationwide relief is particularly inappropriate in the area of immigration and foreign policy, where the political branches are charged with making those judgments. The First Injunction does just that, undermining the Executive's constitutional and statutory authority over immigration and constituting an "unwarranted judicial interference in the conduct of foreign policy." *Kiobel v. Royal Dutch Petroleum*, 569 U.S. 108, 116 (2013); *see also INS v. Legalization Assistance Project of L.A. Cty. Fed'n of Lab.*, 510 U.S. 1301, 1305-06 (1993) (O'Connor, J., in chambers) (criticizing "an improper

intrusion by a federal court into the workings of a coordinate branch of Government").

The district court's cited bases for universal relief are particularly unpersuasive here. For instance, the court incorrectly cited (1) this Court's opinion that was *vacated* by the Supreme Court in a prior decision in *Hawaii* and (2) the *dissent* in *Hawaii*. ER-98 ("[T]he imposition of a nationwide injunction was 'necessary to provide complete relief to the plaintiffs.'") (quoting *Hawaii*, 585 U.S. at 751 n.13 (Sotomayor, J., dissenting) (alteration omitted)); *id.* (citing *Hawaii v. Trump,* 859 F.3d 741, 788 (9th Cir.), *vacated and remanded*, 583 U.S. 941 (2017)). But neither vacated decisions nor dissenting opinions can sustain the district court's universal injunction.

The Second Injunction's reach to cover *all* relevant non-party resettlement partners was equally improper.

The district court's order purports to apply to resettlement partners that are not parties to this suit and requires Defendants to "reinstate all cooperative agreements" potentially resulting in the outlay of millions of dollars by the Government. ER-37. This cost (and denial of the Government's request for preliminary injunction bond) further exacerbates the substantial irreparable harm the Government will suffer absent reversal. Particularly where *contract* rights are at

issue, the district court should not have been permitting Plaintiffs to exercise the putative contract rights of non-parties.

The district court offered no justification for why enjoining the termination of cooperative agreements of non-party resettlement partners was necessary to remedy Plaintiff Resettlement Partners' specific harms. No other resettlement partners were before the district court and the court did not have the complete record of contracting materials related to any entity. *See* ER-149-729 (documenting only two of numerous cooperative agreements at issue). Illustrating this, the Second Injunction even covers non-party resettlement partners who separately sued and *lost*, such as in *Conference of Catholic Bishops*, 2025 WL 763738, at *1. The Second Injunction was far too broad, and the Court should at minimum narrow it.

## CONCLUSION

This Court should reverse the district court's orders issuing the First and Second Preliminary Injunctions.

54

Respectfully submitted,

YAAKOV M. ROTH
*Acting Assistant Attorney General*

DREW C. ENSIGN
*Deputy Assistant Attorney General*

ERNESTO MOLINA
*Acting Director*

DAVID KIM
*Senior Litigation Counsel*

*s/ Joseph McCarter*
JOSEPH MCCARTER
ALEXANDRA YEATTS
LINDSAY ZIMLIKI
JASON ZUBATA
*Trial Attorneys*
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
Washington, DC 20005

*Attorneys for Defendants-Appellants*

55

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a) and Ninth Circuit Rule 32-1(a), I certify that the text of the answering brief is double spaced, proportionately spaced 14-point Times New Roman type; the footnotes are single spaced, proportionately spaced 14-point Times New Roman type; and the brief does not exceed 14,000 words.

*s/ Joseph A. McCarter*
JOSEPH A. MCCARTER
Attorney for Appellants

## CERTIFICATE OF SERVICE

I hereby certify that on April 22, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. Appellees' counsel is a registered CM/ECF user and will be served by the appellate CM/ECF system.

*s/ Joseph A. McCarter*
JOSEPH A. MCCARTER
Attorney for Appellee