Case Nos. 25-1313 & 25-1939

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

PLAINTIFF PACITO; PLAINTIFF ESTHER; PLAINTIFF JOSEPHINE; PLAINTIFF SARA; PLAINTIFF ALYAS; PLAINTIFF MARCOS; PLAINTIFF AHMED; PLAINTIFF RACHEL; PLAINTIFF ALI; HIAS, INC.; CHURCH WORLD SERVICE, INC., and LUTHERAN COMMUNITY SERVICES NORTHWEST,

*Plaintiffs – Appellees,*

v.

DONALD J. TRUMP, in his official capacity as President of the United States; MARCO RUBIO, in his official capacity as Secretary of State; KRISTI NOEM, in her official capacity as Secretary of Homeland Security; ROBERT F. KENNEDY, JR., in his official capacity as Secretary of Health and Human Services,

*Defendants – Appellants.*

On Interlocutory Appeal from the United States District Court for the
Western District of Washington (Whitehead, J.)
2:25-cv-255-JNW

# BRIEF OF *AMICUS CURIAE* IMMIGRATION REFORM LAW INSTITUTE IN SUPPORT OF DEFENDANTS-APPELLANTS AND REVERSAL

Andrew L. Schlafly, Esq.
939 Old Chester Rd.
Far Hills, NJ 07931
(908) 719-8608
aschlafly@aol.com

Counsel for *Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

*Amicus* Immigration Reform Law Institute (IRLI) is a nonprofit corporation having its principal place of business in Washington, D.C. It is not a wholly owned subsidiary of any corporation. It does not have any stock and thus no corporate or publicly held entity owns more than 10% of its stock.

# TABLE OF CONTENTS

**Page**

Corporate Disclosure Statement ................................................................. ii

Table of Contents ................................................................................... iii

Table of Authorities .............................................................................. iv

Identity, Interest and Authority to File ......................................................... 1

Summary of Argument ............................................................................... 2

Argument............................................................................................ 4

I.    The District Court Applied an Incorrect Standard of Review to
      Enjoin the Executive Order, by Improperly Scrutinizing Its Basis ................... 4

II.   The Risk of Terrorism and Other Crimes from Refugees Is a
      Sufficient Rational Basis to Support the President's Suspension
      of USRAP ....................................................................................10

III.  The Funding Termination is Not APA-Reviewable, and the
      District Court Erred in Ruling Otherwise........................................................15

IV.   The Refugee System Implicates Foreign Policy and National
      Security, over which the President Has Independent Authority ..................20

V.    The Nationwide Injunctions Dictating to the Executive Branch
      How to Deal with Refugees Are Judicial Overreach that Create
      a Constitutional Crisis Undermining National Unity ...................................25

Conclusion .........................................................................................26

Certificate of Compliance ......................................................................27

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Pages**

*Al-Nouri v. Blinken*, No. CV-22-00633-PHX-GMS (DMF),
    2023 U.S. Dist. LEXIS 238973 (D. Ariz. June 26, 2023),
    *adopted by* No. CV-22-00633-PHX-GMS,
    2024 U.S. Dist. LEXIS 182556 (D. Ariz. Oct. 7, 2024)....................................22

*Alexander v. Sandoval*, 532 U.S. 275 (2001) ..........................................................18

*Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396 (2003) ................................................20

*Armour v. City of Indianapolis*, 566 U.S. 673 (2012) ..............................................8

*Big Tyme Invs., L.L.C. v. Edwards*, 985 F.3d 456 (5th Cir. 2021) ........................8, 9

*CACI, Inc.-Federal v. United States,* 719 F.2d 1567 (Fed. Cir. 1983)....................18

*Chicago & Southern Air Lines, Inc*. v. *Waterman S.S. Corp*.,
    333 U.S. 103 (1948)............................................................................................21

*Cuban Am. Bar Ass'n v. Christopher*, 43 F.3d 1412 (11th Cir. 1995)....................20

*Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599 (2020)..................................26

*Dep't of State v. Munoz*, 602 U.S. 899 (2024)...........................................................5

*Doe v. Trump*, 288 F. Supp. 3d 1045 (W.D. Wash. 2017) ........................................5

*FCC v. Beach Commc'ns*, 508 U.S. 307 (1993)...........................................6, 7, 8, 9

*First Transit, Inc. v. Pinellas Suncoast Transit Auth.*,
    No. 8:17-CV-814-T-36MAP, 2017 U.S. Dist. LEXIS 193409
    (M.D. Fla. Oct. 30, 2017), *adopted by First Transit, Inc. v.
    Pinellas Suncoast Transit Auth*., No. 8:17-cv-814-T-36MAP,
    2017 U.S. Dist. LEXIS 192444 (M.D. Fla. Nov. 21, 2017)...............................19

*Gilstrap v. United Air Lines, Inc.*, 709 F.3d 995 (9th Cir. 2013) ...........................18

*Haig v. Agee*, 453 U.S. 280 (1981)..........................................................................21

*Harisiades* v. *Shaughnessy*, 342 U.S. 580 (1952) ............................................ 20-21

*Heckler v. Chaney*, 470 U.S. 821 (1985)............................................................15, 16

*Hi-Ridge Lumber Co. v. United States*, 443 F.2d 452 (9th Cir. 1971)........16, 17, 19

*Hodel* v. *Indiana*, 452 U.S. 314 (1981) ....................................................................6

*In re Extradition of Handanovic*, 829 F.Supp.2d 979 (D. Or. 2011) .....................22

iv

*In re Extradition of Velasquez Pedroza*,
  2020 WL 549715 (S.D. Cal. Feb. 4, 2020)........................................................22

*Johnson v. Eisentrager*, 339 U.S. 763 (1950)........................................................20

*Kadrmas v. Dickinson Pub. Sch.*, 487 U.S. 450 (1988)............................................7

*Karouni v. Gonzales*, 399 F.3d 1163 (9th Cir. 2005) ...............................................2

*Kleindienst v. Mandel*, 408 U.S. 753 (1972) ............................................................4

*League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer*,
  814 F. App'x 125 (6th Cir. 2020) ............................................................................8

*Lehnhausen* v. *Lake Shore Auto Parts Co.*, 410 U.S. 356 (1973) ...........................6

*Lesly Yajayra Perdomo v. Holder*, 611 F.3d 662 (9th Cir. 2010) ..........................23

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) .......................................21

*Mathews v. Diaz*, 426 U.S. 67 (1976) .......................................................................4

*Mountain Water Co. v. Mont. Dep't of Pub. Serv. Regul.*,
  919 F.2d 593 (9th Cir. 1990) ...................................................................................7

*Nat'l Ass'n for the Advancement of Multijurisdiction Practice (NAAMJP)*
  *v. Lynch*, 826 F.3d 191 (4th Cir. 2016) ..................................................................9

*Natural Resources Defense Council v. Securities and Exchange Commission*,
  606 F.2d 1031 (D.C. Cir. 1979).............................................................................19

*Nordlinger v. Hahn*, 505 U.S. 1 (1992) ....................................................................7

*Olson v. State of Cal.*, 104 F.4th 66 (9th Cir. 2024) .................................................7

*Pacito v. Trump*, No. 2:25-cv-255-JNW,
  2025 U.S. Dist. LEXIS 36606 (W.D. Wash. Feb. 28, 2025).....................5, 9, 10

*Pacito v. Trump*, No. 2:25-cv-255-JNW,
  2025 U.S. Dist. LEXIS 54263 (W.D. Wash. Mar. 24, 2025).........................9, 18

*Parcel 49C Ltd. P'ship v. United States*, 31 F.3d 1147 (Fed. Cir. 1994)...............17

*Perkins v. Lukens Steel Co.,* 310 U.S. 113 (1940)............................................ 17-18

*Raidoo v. Moylan*, 75 F.4th 1115 (9th Cir. 2023).....................................................7

*Reid v. Rolling Fork Pub. Util. Dist.*, 854 F.2d 751 (5th Cir. 1988) ........................8

*Robleto-Pastora v. Holder*, 591 F.3d 1051 (9th Cir. 2010)....................................11

*Segalman v. Sw. Airlines Co.*, 895 F.3d 1219 (9th Cir. 2018)................................18

*Sierra Club v. Trump*, 929 F.3d 670 (9th Cir. 2019) ...............................................18

*Tahawwur Hussain Rana v. Jenkins*, 113 F.4th 1058 (9th Cir. 2024)...............21, 22

*Talleywhacker, Inc. v. Cooper*, 465 F. Supp. 3d 523 (E.D.N.C. 2020).....................9

*Trump v. Hawaii ("Hawaii III")*, 585 U.S. 667 (2018) .......... 2, 4, 5, 6, 7, 9, 10, 12

*United States v. Tsarnaev*, 595 U.S. 302 (2022) .....................................................11

*United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990) ....................................20

*Ziglar v. Abbasi*, 582 U.S. 120 (2017)...................................................................18

## Constitution, Statutes, Executive Orders, Regulation, and Rule

U.S. CONST. art. II, § 2 .............................................................................................21

5 U.S.C. § 702 ..........................................................................................................18

Immigration and Nationality Act of 1952 ("INA") § 101(a)(42)(A),
    8 U.S.C. § 1101(a)(42)(A)................................................................................23

Executive Order 13815 of October 24, 2017, "Resuming the United States
    Refugee Admissions Program with Enhanced Vetting Capabilities,"
    82 Fed. Reg. 50,055 (Oct. 27, 2017) ...............................................................10

Executive Order 14163 of January 20, 2025, "Realigning the United States
    Refugee Admissions Program," 90 Fed. Reg. 8,459 (Jan. 30, 2025)...............2, 8

2 C.F.R. § 200.340 ...................................................................................................17

FED. R. APP. P. 29(a)(4)(E) .......................................................................................1

## Other Authorities

CE Noticias Financieras English, "Twenty-three years on, what lessons did 9/11
    leave for the markets?" (September 11, 2024) .................................................13

Peter Finn, Carol D. Leonnig & Will Englund, "Tsarnaev Brothers' Homeland
    Was War-Torn Chechnya," *Washington Post* (Apr. 19, 2013)
    https://www.washingtonpost.com/politics/details-emerge-on-suspected-boston-
    bombers/2013/04/19/ef2c2566-a8e4-11e2-a8e2-5b98cb59187f_story.html .....11

Steven Malanga, "No, You're Not Imagining a Migrant Crime Spree," *City Journal* (New York City), Politics and Law (August 2024) https://www.city-journal.org/article/no-youre-not-imagining-a-migrant-crime-spree ...................................................................................................11

Alex Nowrasteh, "Little National Security Benefit to Trump's Executive Order on Immigration," *Cato at Liberty* (January 25, 2017) https://www.cato.org/blog/little-national-security-benefit-trumps-executive-order-immigration ...................................................................................................12

Brian L. Owsley, "Is the Supreme Court Irrational: *Trump v. Hawaii*," 29 S. Cal. Interdis. L.J. 591, 611 (Summer 2020) ........................................ 13-14

Mitch Smith, Rukmini Callimachi & Richard Perez-Pena, "ISIS Calls Ohio State University Attacker a 'Soldier'," *N.Y. Times* (Nov. 29, 2016) https://www.nytimes.com/2016/11/29/us/ohio-state-university-abdul-artan-islamic-state.html ...................................................................................................14

## IDENTITY, INTEREST AND AUTHORITY TO FILE[1]

*Amicus curiae* Immigration Reform Law Institute (IRLI) is a nonprofit corporation that was founded in 1986 and has its principal place of business in Washington, D.C. The mission of IRLI is to promote diligent enforcement of immigration laws consistent with congressional intent. IRLI seeks to help protect all Americans against the substantial harms caused by unlawful immigration and misuse of refugee programs.

IRLI has been involved in litigating more than 120 cases in the U.S. Supreme Court, U.S. Courts of Appeals, U.S. district courts, and state courts. IRLI has filed many *amicus* briefs defending national security and national sovereignty, while also bringing cases to protect American workers and law enforcement officials. The Board of Immigration Appeals (BIA) has made use of IRLI briefs in precedent-setting cases.

The decision in this case likely will have nationwide effects on policies concerning the use of refugee status to allow immigration by large numbers of foreigners.

---

[1] Counsel for Defendants-Appellants have provided consent to the filing of this brief by *Amicus* IRLI, and counsel for Plaintiffs-Appellees have stated that they do not oppose this filing. Pursuant to FED. R. APP. P. 29(a)(4)(E), undersigned counsel certifies that: no counsel for a party authored this brief in any respect; and no party, party's counsel, person or entity – other than *Amicus*, its members, and its counsel – contributed monetarily to this brief's preparation or submission.

*Amicus* IRLI thereby has direct and vital interests in the issues presented here.

## SUMMARY OF ARGUMENT

The suspension of the United States Refugee Admissions Program (USRAP) by President Trump does not justify immediate judicial intervention and the sweeping, nationwide injunctions issued below. The district court applied the wrong legal standard in reviewing a decision by the President concerning foreign nationals and whether to allow them to immigrate into the United States. Under the Supreme Court holding in *Trump v. Hawaii ("Hawaii III")*, 585 U.S. 667 (2018), the appropriate standard of review is rational basis, which means the only proper inquiry by a reviewing court is to determine whether there is any conceivable justification, not whether the President provided one. The injunctions entered below should be vacated and Executive Order 14163 of January 20, 2025, "Realigning the United States Refugee Admissions Program," 90 Fed. Reg. 8,459 (Jan. 30, 2025) ("EO 14163") should be upheld, as a conceivable justification for it plainly exists: to protect American citizens against crime and terrorism by foreign nationals which undeniably result from allowing vast numbers of foreigners to resettle in the United States.

The decision whether to accept, facilitate, and fund refugee resettlement in the United States implicates the foreign policy and national security authority that

2

is nearly exclusively vested in the authority of the President. The suspension of USRAP and the termination of certain funding is non-reviewable under the Administrative Procedure Act (APA), and the district court erred in ruling otherwise. Principles of judicial non-review typically apply to non-action by an agency, and these same principles apply here to require reversal of the injunctions below. To the extent there has been a breach of contract by the federal government, such claims may be properly brought under the Tucker Act in the Court of Federal Claims, and no one is objecting to the availability of that relief for contractual obligations. But the injunctions entered below by the district court go far beyond that by improperly interfering with executive action relating to foreign policy.

Nationwide injunctions against President Trump are piling up like cars in heavy fog on a highway, creating a logjam for the Supreme Court to untangle. Several Justices on the Supreme Court have already expressed frustration with this type of equitable relief, and the Supreme Court majority has stayed such injunctions in other cases. The injunctions rendered below interfere with foreign policy and are easy to resolve under clear, controlling authority, without burdening the High Court with yet another emergency application by the United States. The injunctions below should be vacated with instructions for the district court to dismiss this case entirely.

3

## ARGUMENT

**I.    The District Court Applied an Incorrect Standard of Review to Enjoin the Executive Order, by Improperly Scrutinizing Its Basis.**

The district court applied an incorrect standard of review. There are no substantive constitutional rights at stake here, and the standard of review is at most the rational basis test as explained by the U.S. Supreme Court in *Hawaii III*. There the High Court held that merely a rational basis is sufficient to justify President Trump's ban on foreign nationals entering the United States from seven countries:

> The upshot of our cases in this context is clear: "Any rule of constitutional law that would inhibit the flexibility" of the President "to respond to changing world conditions should be adopted only with the greatest caution," and our inquiry into matters of entry and national security is highly constrained. [*Mathews v. Diaz*, 426 U.S. 67, 81-82 (1976).] We need not define the precise contours of that inquiry in this case. A conventional application of *Mandel*,[2] asking only whether the policy is facially legitimate and bona fide, would put an end to our review.

---

[2] *Mandel* held that:

> In summary, plenary congressional power to make policies and rules for exclusion of aliens has long been firmly established. In the case of an alien excludable under § 212 (a)(28), Congress has delegated conditional exercise of this power to the Executive. We hold that when the Executive exercises this power negatively on the basis of a facially legitimate and bona fide reason, ***the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification*** against the First Amendment interests of those who seek personal communication with the applicant.

*Kleindienst v. Mandel*, 408 U.S. 753, 769-70 (1972) (emphasis added).

4

*Hawaii III*, 585 U.S. at 704. This undemanding rational basis standard of review should have been used by the court below, but was not.

The court below correctly found that there are no substantive constitutional rights concerning USRAP, by expressly drawing a "fundamental distinction between this case and" *Dep't of State v. Munoz*, 602 U.S. 899, 909 (2024), as follows:

> In *Muñoz*, the Supreme Court addressed whether a United States citizen possessed a constitutional liberty interest in having her foreign-national spouse admitted to this country. The plaintiff there asserted that the right to live with her noncitizen spouse was "implicit in the 'liberty' protected by the Fifth Amendment," and claimed that the unexplained denial of her husband's visa application violated this interest. 602 U.S. at 902-03. The Court rejected this position, finding ***no unenumerated constitutional right*** to secure a noncitizen spouse's entry into the United States. *Id.* at 903.
>
> Here, in contrast, Esther's interest stems not from constitutional implications but from a specific statutory entitlement. Under 8 U.S.C. § 1157(c)(2)(A), spouses and children of refugees "shall be entitled to the same admission status" when following to join the principal refugee. This mandatory language establishes a substantive right, not a discretionary privilege. Other courts examining this statute have reached the same conclusion. *See* [*Doe v. Trump*, 288 F. Supp. 3d 1045, 1078-79 (W.D. Wash. 2017)].

*Pacito v. Trump*, No. 2:25-cv-255-JNW, 2025 U.S. Dist. LEXIS 36606, at *63-64 (W.D. Wash. Feb. 28, 2025) (emphasis added). In other words, the district court based its injunction on "a specific statutory entitlement," rather than on any substantive constitutional right, because no such constitutional right exists here.

Accordingly, the above central finding by the district court should have triggered the same rational basis test that the Supreme Court applied in *Hawaii III*. Under this rational basis test, it is not necessary for the President (or a legislature) to articulate the rational basis, but merely that there be a conceivable rational basis that can be conceived to justify the action. "[T]hose attacking the rationality of the legislative classification have the burden 'to negative every conceivable basis which might support it.'" *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993) (quoting *Lehnhausen* v. *Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973), its internal quotation marks omitted). *See also Hodel* v. *Indiana*, 452 U.S. 314, 331-32 (1981). "Moreover, because we never require a legislature to articulate its reasons for enacting a statute, it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature." *Beach Commc'ns*, 508 U.S. at 315.

The nearly unanimous Supreme Court decision in *Beach Commc'ns*, without any dissent and merely one concurrence, further held that:

> In other words, a legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data. Only by faithful adherence to this guiding principle of judicial review of legislation is it possible to preserve to the legislative branch its rightful independence and its ability to function.

*Beach Commc'ns*, 508 U.S. at 315 (inner quotations and citations omitted).

This Court has repeatedly held likewise:

6

We need not rely on the legislature to proffer its actual rationale motivating the legislation—or any rationale, for that matter. *See* [*Nordlinger v. Hahn*, 505 U.S. 1, 15 (1992)]. We may consider any "purposes the legislature, litigants, or district court have espoused," but we are not limited to those reasons—we may consider "*any* other rational purposes *possibly* motivating enactment of the challenged statute." *Mountain Water Co. v. Mont. Dep't of Pub. Serv. Regul.*, 919 F.2d 593, 597 (9th Cir. 1990) (emphases added) (citing *Kadrmas v. Dickinson Pub. Sch.*, 487 U.S. 450, 457–463, 108 S. Ct. 2481, 101 L. Ed. 2d 399 (1988)). And so long as there is some conceivable legitimate purpose justifying the statute, we need not inquire into the legislature's actual purpose in enacting it. *Raidoo v. Moylan*, 75 F.4th 1115, 1121 (9th Cir. 2023) (citing *Beach Commc'ns, Inc.*, 508 U.S. at 315).

*Olson v. State of Cal.*, 104 F.4th 66, 78 (9th Cir. 2024) (emphasis in original).

This highly deferential rational basis test applies fully to executive orders, as held in the Supreme Court *Hawaii III* decision quoted above and in many decisions in recent years that upheld executive orders by governors. For example, the Sixth Circuit upheld an Executive Order by the Governor of Michigan to close various types of businesses during Covid, by applying a "rational speculation" standard of review. The Sixth Circuit explained that the standard of review of an executive order is very deferential:

Utilizing that legal framework, we presume the Order is constitutional, making it incumbent upon Plaintiffs to negate "every conceivable basis which might support" it. That is no easy task. ***Plaintiffs must disprove all possible justifications*** for the Order regardless whether those justifications actually motivated the Governor's decisionmaking.

*League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer*, 814 F. App'x 125, 128 (6th Cir. 2020) (quoting *Armour v. City of Indianapolis*, 566 U.S. 673, 681 (2012), and citing *Beach Commc'ns, Inc.*, 508 U.S. at 313-15, emphasis added). The Sixth Circuit concluded: "[u]nder this test, the Governor's action is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data." 814 F. App'x at 128 (inner quotations omitted).

But an inappropriate "courtroom fact-finding" is exactly what the district court performed below to enjoin EO 14163 by the President, who is not required to provide any justification for his action as long as one is conceivable. And justifications for EO 14163 here plainly are conceivable, including reducing the risk of terrorism and other crimes as explained in Point II below.

Many additional judicial decisions have upheld Executive Orders by governors under the same deferential rational basis standard that should have been used below. The Fifth Circuit upheld a Louisiana governor's executive order by explaining that "[a]s long as there is a conceivable rational basis for the official action, it is immaterial that it was not the or a primary factor in reaching a decision or that it was not actually relied upon by the decisionmakers or that some other nonsuspect irrational factors may have been considered." *Big Tyme Invs., L.L.C. v. Edwards*, 985 F.3d 456, 469 (5th Cir. 2021) (quoting *Reid v. Rolling Fork Pub. Util. Dist.*, 854 F.2d 751, 754 (5th Cir. 1988), emphasis omitted). There, as below,

8

plaintiffs failed to "carry their burden 'to negative every conceivable basis which might support it.'" *Big Tyme Invs.*, 985 F.3d at 469 (quoting *Armour*, 566 U.S. at 685, internal quotation marks and citation omitted).

Similarly, in denying a motion for a preliminary injunction against a North Carolina governor's executive order, a federal district court held that "[w]here there are plausible reasons for the rule, [the court's] inquiry is at an end." *Talleywhacker, Inc. v. Cooper*, 465 F. Supp. 3d 523, 537 (E.D.N.C. 2020) (quoting *Nat'l Ass'n for the Advancement of Multijurisdiction Practice (NAAMJP) v. Lynch*, 826 F.3d 191, 196 (4th Cir. 2016), quoting *Beach Commc'ns*, 508 U.S. at 313-14, bracketing preserved).

Yet the district court below never addressed whether there are plausible reasons for suspending the refugee program, and instead embarked on extensive fact-finding into defendants' expressed rationale. *See, e.g.*, *Pacito v. Trump*, 2025 U.S. Dist. LEXIS 36606, at *61 ("As with the Agency Suspension, the Agency Defendants provided no reasoned explanation for the Refugee Funding Suspension."); *Pacito v. Trump*, No. 2:25-cv-255-JNW, 2025 U.S. Dist. LEXIS 54263, at *31-34 (W.D. Wash. Mar. 24, 2025) (engaging in extensive factfinding without considering conceivable alternative rationales). This was an error of law by the district court under the well-established precedents of *Hawaii III* and *Beach Commc'ns*, and the long line of additional authority identified above.

9

The district court below failed to adequately distinguish these controlling precedents. The lower court, in referencing *Hawaii III*, relied entirely on its general statements that a President's power is not unlimited to conclude that "[t]his reasoning establishes the principle that the President's invocation of Section 1182(f) becomes unlawful and ultra vires when it overrides or conflicts with the INA's statutory provisions." *Pacito v. Trump*, 2025 U.S. Dist. LEXIS 36606, at *28 (citing 8 U.S.C. § 1182(f)). But President Trump has not violated any statutes by suspending USRAP. No reasonably informed observer would be genuinely surprised if President Trump, to relieve pressure in a troubled foreign region or to reach an accommodation with an ally, restarted the admission of refugees as he did previously during his first presidency. *See, e.g.*, Executive Order 13815 of October 24, 2017, "Resuming the United States Refugee Admissions Program with Enhanced Vetting Capabilities," 82 Fed. Reg. 50,055 (Oct. 27, 2017).

## II.    The Risk of Terrorism and Other Crimes from Refugees Is a Sufficient Rational Basis to Support the President's Suspension of USRAP.

One can rationally speculate that there is an increased risk of terrorism and other crimes by refugees who are resettled into the United States. For example, the Boston Marathon bombers, who killed "three and wound[ed] hundreds" at that annual event, were members of a family allowed to remain in the United States program as asylees after satisfying the requirements for refugees similar to

10

USRAP. *United States v. Tsarnaev*, 595 U.S. 302, 302 (2022); Peter Finn, Carol D. Leonnig & Will Englund, "Tsarnaev Brothers' Homeland Was War-Torn Chechnya," *Washington Post* (Apr. 19, 2013) ("After the Tsarnaevs obtained asylee status, they successfully applied for derivative asylee status for their children" who perpetrated the massacre.).[3] Both legislative history and this Court recognize that asylees and refugees have "essentially equivalent status under the law." *Robleto-Pastora v. Holder*, 591 F.3d 1051, 1061 (9th Cir. 2010) (inner quotations omitted).

President Trump's Executive Order suspending USRAP comes after "[f]our years of open borders and sanctuary policies [that] have brought criminal drug networks, human trafficking, and an epidemic of sexual assault." Steven Malanga, "No, You're Not Imagining a Migrant Crime Spree," *City Journal* (New York City), Politics and Law (August 2024).[4] Some foreign nationals are violently hostile to the United States, while others cannot or do not assimilate well into American society and turn to crime instead. These are undeniable facts that the district court overlooked while rendering its injunctions below.

---

[3] https://www.washingtonpost.com/politics/details-emerge-on-suspected-boston-bombers/2013/04/19/ef2c2566-a8e4-11e2-a8e2-5b98cb59187f_story.html (viewed April 22, 2025).

[4] https://www.city-journal.org/article/no-youre-not-imagining-a-migrant-crime-spree (viewed April 22, 2025).

In an article published by the respected libertarian organization Cato Institute, which is sympathetic to immigration, the author was critical of President Trump's ban on travel from seven countries in 2017 which was ultimately upheld by the Supreme Court in *Hawaii III. See* Alex Nowrasteh*,* "Little National Security Benefit to Trump's Executive Order on Immigration," *Cato at Liberty* (January 25, 2017).[5] "[B]etween 1975 and the end of 2015[, s]ix Iranians, six Sudanese, two Somalis, two Iraqis, and one Yemini have been convicted of attempting or carrying out terrorist attacks on U.S. soil." *Id.* That is not very many, the article urges, but the standard for rational basis review does not require a strong justification or even evidence of any justification. It merely requires a conceivable speculative justification, and that exists for terrorism and other crimes inevitably committed by some foreign nationals who are brought into the United States as refugees. It does not matter for the purpose of the rational basis test whether this crime rate is greater or less than similar acts, if any, committed by American citizens. Where a rational basis exists, and it does here, it is not for a court to second-guess the decision of the President.

This Cato article addresses directly the issue of terrorism committed by refugees:

---

[5] https://www.cato.org/blog/little-national-security-benefit-trumps-executive-order-immigration (viewed April 23, 2025).

12

From 1975 to the end of 2015, 20 refugees have been convicted of attempting or committing terrorism on U.S. soil, and only three Americans have been killed in attacks committed by refugees—all in the 1970s. Zero Americans have been killed by Syrian refugees in a terrorist attack on U.S. soil. The annual chance of an American dying in a terrorist attack committed by a refugee is one in 3.6 *billion*. The other 17 convictions have mainly been for aiding or attempting to join foreign terrorists.

*Id.* (emphasis in original).

But as reflected by its name, terrorism has the goal of frightening far more than the direct victims of the crime itself. The 9/11 terrorist "attacks caused a 0.5% drop in US GDP, the loss of 600,000 jobs, mainly in financial services, hospitality and air transport (between 75,000 and 100,000 in New York alone). Unemployment rose significantly, the recession worsened, although GDP had begun to recover in early 2002." CE Noticias Financieras English, "Twenty-three years on, what lessons did 9/11 leave for the markets?" (September 11, 2024). Like some refugees, perpetrators of the 9/11 attacks were foreign nationals from regions of the world harboring hostility towards the United States.

Critics of President Trump's travel ban in 2017 point out that the perpetrators of terrorism on U.S. soil were foreign nationals, but not from the countries targeted by Trump's travel ban. Likewise, 'no refugees from Iran, Libya, Somalia, Sudan, Syria, or Yemen have killed anyone during a domestic terrorist attack." Brian L. Owsley, "Is the Supreme Court Irrational: *Trump v. Hawaii*," 29

13

S. Cal. Interdis. L.J. 591, 611 (Summer 2020). For example, "on November 28, 2016, Abdul Razak Ali Artan, a refugee from Somalia, drove a Honda Civic through a crowd on the campus of Ohio State University in Columbus, Ohio," and then emerged from "his car wielding a butcher knife," and the terrorist was shot dead after he wounded 13 others. Mitch Smith, Rukmini Callimachi & Richard Perez-Pena, "ISIS Calls Ohio State University Attacker a 'Soldier'," *N.Y. Times* (Nov. 29, 2016).[6]

Most Americans were adversely affected by 9/11, and millions in Ohio were indirectly harmed by the terrorist attack on the Ohio State University campus by the Somali refugee even though he did not kill anyone. Terrorism by foreigners on U.S. soil may be quite rare, but it is heavily publicized when it happens and it happens enough to constitute justification under the rational basis standard for President Trump's suspension of a program bringing foreign nationals into the United States. The district court erred in failing to recognize this rationale, and failed apply the correct deferential standard of review to it.

---

[6] https://www.nytimes.com/2016/11/29/us/ohio-state-university-abdul-artan-islamic-state.html (viewed April 23, 2025).

14

### III.   The Funding Termination is Not APA-Reviewable, and the District Court Erred in Ruling Otherwise.

The termination of funding for aspects of the refugee program is not reviewable under the APA because it is inherently a forbearance by an agency, and thus qualifies as a non-reviewable type of non-action. An agency suspending expenditures on a program is analogous to a non-enforcement decision, and both types of decisions can be based on an agency preference to conserve resources or spend them more efficiently. This is particularly true in the context of refugee resettlement, where the President acts in cooperation with other countries that are typically closer to the violent conflict or persecution, and which may offer resettlement at less cost than the U.S. The district court erred in ordering a federal agency to affirmatively do something – spend money in a potentially inefficient or wasteful manner – when it would prefer to do nothing.

The widely followed Supreme Court ruling in *Heckler v. Chaney* is controlling here. 470 U.S. 821 (1985). There the Court held that the APA does not provide for judicial review of a decision by the Food and Drug Administration (FDA) not to enforce a drug law with respect to lethal injections for capital punishment. The Court identified multiple reasons why such a decision is non-reviewable by the judiciary, several of which apply here and require reversal of the injunctions below. An agency decision not to spend money is nearly

15

indistinguishable fiscally from an agency decision not to take an enforcement action.

"[W]hen an agency refuses to act it generally does not exercise its *coercive* power over an individual's liberty or property rights, and thus does not infringe upon areas that courts often are called upon to protect." *Id.* at 832 (emphasis in original). Likewise, the refusal by the government to spend more money on refugees does not infringe on any cognizable right of refugees, who lack any entitlement to the funds. Nor is there third-party standing rights of the organizations to demand money to which the refugees are not entitled. The refugee program is not for the benefit of any organization, but rather is for the benefit of refugees in the sole discretion of the Executive Branch.

The reasoning of this Court in declining to exercise judicial review over an agency decision to reject all bids for some timber is illustrative here. *See Hi-Ridge Lumber Co. v. United States*, 443 F.2d 452 (9th Cir. 1971). When "several compelling reasons exist to justify nonreview," a court should not order an agency to take action. *Id.* at 455. There, as here, "the authority delegated is quite broad." Indeed, the authority granted to the Executive Branch by the USRAP is vast, as set forth in the governing regulation on which the government relies:

(a) The Federal award may be terminated in part or its entirety as follows:

16

(1) By the Federal agency or pass-through entity if the recipient or subrecipient fails to comply with the terms and conditions of the Federal award;

(2) By the Federal agency or pass-through entity with the consent of the recipient or subrecipient, in which case the two parties must agree upon the termination conditions. These conditions include the effective date and, in the case of partial termination, the portion to be terminated;

(3) By the recipient or subrecipient upon sending the Federal agency or pass-through entity a written notification of the reasons for such termination, the effective date, and, in the case of partial termination, the portion to be terminated. However, if the Federal agency or pass-through entity determines that the remaining portion of the Federal award will not accomplish the purposes for which the Federal award was made, the Federal agency or pass-through entity may terminate the Federal award in its entirety; or

(4) By the Federal agency or pass-through entity pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities.

2 C.F.R. § 200.340. The above enumerated grounds for federal termination of an USRAP award are virtually unlimited in scope. As in the foregoing *Hi-Ridge Lumber* decision to defer entirely to the agency, "we have no standards before us by which we could review the rejection of all bids. The development of such criteria and factors to be weighed would be too onerous a burden upon this or any court." *Hi-Ridge Lumber*, 443 F.2d at 455.

Plaintiffs are analogous to disappointed bidders on federal government contracts who, prior to 1970, did not have standing to challenge an award of a contract to another. *Parcel 49C Ltd. P'ship v. United States*, 31 F.3d 1147, 1152 (Fed. Cir. 1994); *see also Perkins v. Lukens Steel Co.*, 310 U.S. 113, 125-26

17

(1940) (superseded by statute as stated in *CACI, Inc.-Federal v. United States,* 719 F.2d 1567, 1572 (Fed. Cir. 1983)). USRAP does not provide a private cause of action to disappointed refugees or organizations assisting refugees. As this Court has held, "[w]e are bound by current Supreme Court law, and under that law, a private cause of action does not exist where the statute in question does not manifest Congress's intent to create one." *Segalman v. Sw. Airlines Co.*, 895 F.3d 1219, 1229 (9th Cir. 2018) (citing *Alexander v. Sandoval*, 532 U.S. 275, 286-87 (2001)). In *Sandoval*, the Court "narrowed the framework for evaluating whether a statute implies a private cause of action." *Gilstrap v. United Air Lines, Inc.*, 709 F.3d 995, 1002 (9th Cir. 2013); *see also Ziglar v. Abbasi*, 582 U.S. 120, 132-33 (2017).

The district court did an unwarranted end run around *Sandoval* by holding that "[t]he APA itself provides the cause of action here, allowing judicial review of final agency action when there is no other adequate remedy available." *Pacito v. Trump*, 2025 U.S. Dist. LEXIS 54263, at *30 (citing 5 U.S.C. § 702 and *Sierra Club v. Trump*, 929 F.3d 670, 694 (9th Cir. 2019)). But the district court's approach would render a nullity the limitation imposed by the Supreme Court in *Sandoval*, as the lawsuit below is an assertion of individual rights based on a statute that does not provide for a private cause of action. Substance takes precedent over form, and casting the lawsuit below as one based on the APA is

insufficient to create the equivalent of a private cause of action out of thin air. *See First Transit, Inc. v. Pinellas Suncoast Transit Auth.*, No. 8:17-CV-814-T-36MAP, 2017 U.S. Dist. LEXIS 193409, at *15 (M.D. Fla. Oct. 30, 2017) (plaintiff "offers no argument and provides me with no authority to suggest Congress intended to create a private cause of action in this situation"), *adopted by First Transit, Inc. v. Pinellas Suncoast Transit Auth.*, No. 8:17-cv-814-T-36MAP, 2017 U.S. Dist. LEXIS 192444 (M.D. Fla. Nov. 21, 2017).

Ultimately, as this Court held in *Hi-Ridge Lumber*, "[t]his Court has neither the technical expertise nor the intuitive knowledge gained from daily acquaintance with this subject to provide an informed review of executive decision-making." *Hi-Ridge Lumber*, 443 F.2d at 455. There is no "need for judicial supervision to safeguard the interests of the plaintiffs." *Natural Resources Defense Council v. Securities and Exchange Commission*, 606 F.2d 1031, 1044 (D.C. Cir. 1979). Refugees lack substantive rights under the U.S. Constitution, so there is no reason for a court to enjoin presidential action on this issue.

As explained by the Eleventh Circuit:

Clearly, aliens who are outside the United States cannot claim rights to enter or be paroled into the United States based on the Constitution.

Therefore, any right to equal protection of the laws, due process, or rights under the INA or the Refugee Convention now asserted by the Haitian and Cuban migrants are not cognizable. Thus, neither group of migrants could have a "substantial likelihood of success on the merits"

19

> which is a necessary predicate to the grant of injunctive relief. The district court erred in granting relief to the individual Cuban and Haitian migrants.

*Cuban Am. Bar Ass'n v. Christopher*, 43 F.3d 1412, 1428-29 (11th Cir. 1995). This is in accord with Supreme Court holdings declining to apply Fourth and Fifth Amendment rights to non-citizens extraterritorially. See *United States v. Verdugo-Urquidez*, 494 U.S. 259, 274-75 (1990) (rejecting Fourth Amendment limitations on the search and seizure of property owned by a non-resident alien conducted in Mexico by United States agents); *Johnson v. Eisentrager*, 339 U.S. 763, 784 (1950) (rejecting a Fifth Amendment claim by aliens outside the sovereign territory of the United States).

## IV.  The Refugee System Implicates Foreign Policy and National Security, over which the President Has Independent Authority.

It is well-established that the President has "independent authority in the areas of foreign policy and national security," and the Supreme Court has repeatedly invalidated encroachment on that. *See, e.g.*, *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 429 (2003) (striking down a California law that would have helped Holocaust victims, inner quotations omitted). This virtually exclusive authority of the President can hardly be doubted, as the Supreme Court has explained:

> Matters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention. In *Harisiades v.*

> *Shaughnessy*, 342 U.S. 580 (1952), the Court observed that matters relating "to the conduct of foreign relations ... are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." *Id.*, at 589; accord, *Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp*., 333 U.S. 103, 111 (1948).

*Haig v. Agee*, 453 U.S. 280, 292 (1981).

Recently this Court rejected an argument, based on the overturning of *Chevron* doctrine, for less judicial deference to the Executive Branch on matters related to immigration:

> [T]he logic underpinning *Chevron* deference is entirely distinct from the logic underpinning a deference to the Executive in matters of foreign affairs, *see* U.S. Const. art. II, § 2; *Haig v. Agee*, 453 U.S. 280, 293-94, 101 S. Ct. 2766, 69 L. Ed. 2d 640 (1981) ("[T]he generally accepted view [is] that foreign policy was the province and responsibility of the Executive."), *Loper Bright* has no effect on our decision here.

*Tahawwur Hussain Rana v. Jenkins*, 113 F.4th 1058, 1066 (9th Cir. 2024).

The underlying facts in the extradition affirmed by this Court in *Rana* illustrates the reality of terrorism by foreign nationals who come to the United States. Rana was not committing terrorism here, but was convicted and imprisoned for supporting terrorism in India and in Denmark:

> Tahawwur Hussain Rana, a Pakistani national, was tried in a United States district court on charges related to his support for a terrorist organization that carried out large-scale terrorist attacks in Mumbai, India. A jury convicted Rana of providing material support to a foreign terrorist organization and conspiring to provide material support to a foiled plot to carry out terrorist attacks in Denmark.

21

*Id.* at 1061.

Refugees are regularly extradited to foreign countries for prosecution there, which debunks the notion that they are all law-abiding migrants seeking peace. *See, e.g.*, *Al-Nouri v. Blinken*, No. CV-22-00633-PHX-GMS (DMF), 2023 U.S. Dist. LEXIS 238973, at *173 (D. Ariz. June 26, 2023) (explaining that the petitioner was "admitted to the United States as a refugee" while approving his extradition back to Iraq), *adopted by* No. CV-22-00633-PHX-GMS, 2024 U.S. Dist. LEXIS 182556, at *2 (D. Ariz. Oct. 7, 2024) (approving the extradition of this refugee based on charges of murder in Iraq, carrying the maximum penalty of death, for the refugee's alleged role "in planning and executing the murders of two Fallujah police officers in 2006"); *In re Extradition of Handanovic*, 829 F.Supp.2d 979 (D. Or. 2011) (certifying extradition of a Bosnian refugee); *In re Extradition of Velasquez Pedroza*, 2020 WL 549715, at *5-6 (S.D. Cal. Feb. 4, 2020) (certifying extradition of a Guatemalan refugee to Finland).

No one credibly doubts that President Trump has the authority to reduce the numbers of refugees to 10,000 annually or to a lower number as he may choose. The number of refugees admitted annually has fluctuated widely throughout multiple administrations of both political parties since USRAP was enacted in 1980, depending on a variety of factors, political winds, and the views of the

President at the time. If the President has the authority to reduce the number of refugees to 1,000 or 100 or even less, then he can lawfully suspend the program too. The plaintiff organizations do not have an entitlement to continued full funding at prior levels after the recent presidential election that spoke loudly and clearly against allowing foreign nationals into the United States, and there is no meaningful legal distinction between a refugee program that admits 10,000, or 100, or even zero in a given year.

Admitting and resettling refugees is inherently a sovereign prerogative exercised by the president in conducting foreign policy, as decisions are made among multiple countries about whether refugees should be taken in, and where. The purpose of a refugee program is to relocate people temporarily after they are displaced due to a war, or violent persecution based on their race, religion, nationality, political opinion or membership in a particular group. "An alien establishes refugee status if she is unable or unwilling to return to her country of nationality either because of past persecution or a well-founded fear of future persecution on account of her race, religion, nationality, political opinion or membership in a particular social group." *Lesly Yajayra Perdomo v. Holder*, 611 F.3d 662, 665 (9th Cir. 2010) (citing INA § 101(a)(42)(A); 8 U.S.C. § 1101(a)(42)(A); *Karouni v. Gonzales*, 399 F.3d 1163, 1170 (9th Cir. 2005)). Taking in refugees from a foreign country affects the relationship of the United

23

States with that nation, with neighboring nations, and with other countries that accept refugees from there. The United States can be drawn into a foreign conflict, resulting in sending American troops or weaponry, by embarking on a program to accept refugees from that region. Stated simply, Americans are often put into harm's way by a refugee program.

As one of the most expensive countries in which to live, the United States is a relatively exorbitant place to resettle refugees in order to protect them from danger. Alternative, less-expensive nations closer to the regions involved would typically make more sense for all involved. The President can quickly make those cost-benefit tradeoffs far better than a court can, and the Constitution confers on the President nearly exclusive authority over foreign policy, in which refugee resettlement is inexorably entwined.

More than three million refugees have settled permanently in the United States under USRAP as most are using this program for ordinary immigration rather than the originally intended refugee-program purpose of providing temporary protection from foreign harm. Some refugees have brought with them criminal or terrorist mindsets, as demonstrated by court decisions cited above. Far from intending to return to their country of origin once the alleged threat to their lives were to pass there, refugees have remained in the United States often without assimilating into our culture. The refugee program was never intended by Congress

24

to become an omnibus immigration program, but rather a procedure to be used or not used at the discretion of the President. There is no legitimate role for the judiciary to broadly impede this decision-making by the President concerning refugees.

### V.    The Nationwide Injunctions Dictating to the Executive Branch How to Deal with Refugees Are Judicial Overreach that Creates a Constitutional Crisis Undermining National Unity.

The sweeping nationwide injunctions below, along with many other universal injunctions being likewise granted nearly daily against the president, are sparking a misguided and unnecessary constitutional crisis. These injunctions are piling up on the docket of the U.S. Supreme Court, which is already busy with its ordinary caseload. While this makes for good legal theater, this is not good for national unity, particularly so soon after a national election that purportedly resolved some underlying issues.

The nationwide injunctions issued by the district court in this case are particularly unjustified. At a minimum, the injunctions below should be narrowed to only the parties in this case, as the category of foreign nationals is too amorphous and they do not have a right to obtain protection or entitlements to settle as refugees in the United States. As two of the Supreme Court Justices stated their frustration about these injunctions in the same context of immigration:

25

> The real problem here is the increasingly common practice of trial courts ordering relief that transcends the cases before them. Whether framed as injunctions of "nationwide," "universal," or "cosmic" scope, these orders share the same basic flaw—they direct how the defendant must act toward persons who are not parties to the case. …
>
> This is not normal. Universal injunctions have little basis in traditional equitable practice.

*Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch and

Thomas, JJ., concurring). In that case this Court had stayed a universal injunction,

as the Supreme Court then likewise granted a stay on appeal from another circuit.

In a similar vein, this Court should overturn the nationwide injunctions entered

below.

## CONCLUSION

For the foregoing reasons, the injunctions issued below should be reversed.

Dated:  April 28, 2025                Respectfully submitted,

/s/ Andrew L. Schlafly

Andrew L. Schlafly
Attorney at Law
939 Old Chester Rd.
Far Hills, NJ 07931
Phone:  (908) 719-8608
Fax:  (908) 934-9207
Email: aschlafly@aol.com

*Counsel for Amicus Curiae Immigration Reform Law Institute*

26

## CERTIFICATE OF COMPLIANCE

1. This brief has been prepared using Times New Roman 14-point, proportionately spaced, serif typeface, in Microsoft Word.

2. This brief complies with FED. R. APP. P. 29(a)(5) and Ninth Circuit Rule 32-1 because it contains a total of 6,191 words, excluding material not counted under Rule 32(f).

Dated:  April 28, 2025

/s/ Andrew L. Schlafly
Andrew L. Schlafly
*Counsel for Amicus Curiae*
*Immigration Reform Law Institute*